**William J. WINEBERG, and the Estate of Janet R. Wineberg, Deceased, William J. Wineberg, Executor, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 18209.**

United States Court of Appeals Ninth Circuit.

Dec. 16, 1963.

Rehearing Denied Feb. 20, 1964.

Davidson, Duffy & Stout and Charles P. Duffy, Portland, Or., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney and Carolyn R. Just, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before HAMLIN and DUNIWAY, Circuit Judges, and TAVARES, District Judge.

TAVARES, District Judge.

This appeal involves deficiencies in federal income taxes for the years 1950 through 1953, in the total amount of $132,234.18, plus additions to tax (under I.R.C.1939, Sec. 294(d)) of $13,877.03. The taxpayer and his wife[1] filed joint income tax returns for the taxable years 1950 through 1953 with the District Director of Internal Revenue for the District of Washington, at Tacoma, Washington. Since all questions hereinafter considered involve only the Internal Revenue Code of 1939, as amended, all references in this opinion to the Internal Revenue Code, or I.R.C., are to be understood as referring to the Internal Revenue Code of 1939 as amended. On November 10, 1958 the Commissioner of Internal Revenue mailed a Notice of Deficiency for the four taxable years in certain specified amounts, totaling, with alleged additions under I.R.C. Sec. 294 (d), $139,969.94. On January 26, 1959, the taxpayer filed a petition with the Tax Court for a redetermination of the deficiency under the provisions of Section 272, I.R.C. In an Amended Answer the Commissioner asserted additional deficiencies and additions and adjustments to the tax, for the four years in question.

Many facts were stipulated to and in addition both sides adduced testimony and other evidence in support of their respective positions, the petitioners' main witness being taxpayer himself. For the government, besides facts brought out on cross-examination of taxpayer, there was adduced testimony of an Internal Revenue Agent who did the final investigation for the government, together with that of seven other witnesses, some of them being former employees of taxpayer and others being persons who were involved in some of the transactions out of which the alleged liability of taxpayer arose.

1. For convenience William J. Wineberg is sometimes referred to in the singular as "the taxpayer" or the "petitioner" although the estate of his wife, Janet R. Wineberg, is also a petitioner, she having filed joint income tax returns with her husband for the taxable years in question.

The Tax Court entered a decision, entitled "Memorandum, Findings of Fact and Opinion," of 114 printed pages in the transcript of record, going into the issues and evidence in rather full detail, and rendered a final decision based upon this Memorandum, Findings of Fact and Opinion,[2] holding as follows:

"Ordered and Decided: That there are deficiencies in income taxes and additions to the tax due from the petitioners as follows:

| | | Deficiency Additions to the Tax (1939 Code) | |
| Year | Income Tax | Sec. 293(b) | Sec. 294(d) |
| 1950 | $18,902.06 | None | — |
| 1951 | 32,562.22 | None | — |
| 1952 | 45,887.27 | None | $9,318.96 |
| 1953 | 34,882.63 | None | 4,558.07." |

In so doing the Tax Court reduced very substantially the amount of additional taxes claimed by the government, including rulings adverse to the government on the issue of fraud, and other rulings denying claims of additional unreported income.

2. This decision has not been officially reported.

3. 1. Is there substantial evidence to support the Tax Court's finding that the taxpayer was regularly engaged in the business of selling timber in the years 1950 through 1953, and that timber sold in the disputed transactions in those years was held primarily for sale in the ordinary course of business, so that the gain from those sales constituted ordinary income under Section 22(a) of the Internal Revenue Code of 1939, rather than capital gain within the meaning of Section 117(a) (1) of the Internal Revenue Code of 1939?

2. Is the taxpayer entitled to the benefits of Section 117(j) and (k) (2) of the Internal Revenue Code of 1939 with respect to the disputed sales or timber?

3. Did the Tax Court err in sustaining the Commissioner's determination that four sales of timber in the taxable years did not qualify under Section 112 (b) (1) of the Internal Revenue Code of 1939 as a nontaxable exchange of like properties held for productive use in trade or business or for investment, by reason of the conveyance of certain timberlands to the taxpayer, and that the entire realized gain from the four timber sales is taxable in the years of sale?

4. Did the Tax Court err in holding that the taxpayer's gain from the sale

We adopt the statement of the issues set forth on pages 3 to 4 of the Respondent's Answering Brief, and quoted in footnote,[3] as being more simple and less repetitive of overlapping contentions than the specification of errors contained in Petitioner's Opening Brief.

of timber to Ledgett in 1952 was taxable as ordinary income, since the sale did not qualify for capital gains treatment under Section 117(d) (2) of the Internal Revenue Code of 1939 as a sale in which the taxpayer retained or reserved an economic interest in the timber?

5. Did the Tax Court err in holding that production royalties received by the taxpayer in 1951, 1952, and 1953 were property reported by the taxpayer as ordinary income and were not entitled to capital gains treatment under Section 117 (k) (2) of the Internal Revenue Code of 1939?

6. Did the Tax Court err in holding that the taxpayer's sale of 675 shares of Yaquina Bay Mills stock in 1951 resulted in short-term capital gain of $37,809 rather than in a short-term capital loss of $10,000?

7. Did the Tax Court err in holding that an amount the taxpayer received in 1950 for the use of a road was rent for the granting of a 10-year lease, rather than proceeds from the sale of an interest in land, and thus that it was taxable as ordinary income and not at capital gains rates?

8. Does the record support the Tax Court's decision that $5,000 paid by the taxpayer to a church in 1953 was not a gift or charitable contribution within the meaning of Section 23(o) of the Internal

## ISSUE NO. 1.

 The first issue is whether there was substantial evidence to support the Tax Court's finding that the taxpayer was regularly engaged in the business of selling timber in the years 1950 through 1953 and that timber sold in the disputed transactions in those years was held primarily for sale in the ordinary course of business, so that the gain from those sales constituted ordinary income under Section 22(a) of the Internal Revenue Code of 1939, rather than a capital gain within the meaning of Section 117(a) (1) of that Code. The taxpayer claimed that the sales in question were sales of capital assets and hence that the profits therefrom were capital gains. The sections in question are quoted in the Appendix.

The Tax Court held that during the taxable years in question the taxpayer was engaged in the trade or business of selling timber. We agree with the Tax Court that what constitutes a trade or business is a question of fact.[4]

A careful reading of the record of facts stipulated to and the transcript of testimony, including the cross-examination of the taxpayer himself, discloses that there is very substantial evidence to support the Court's ruling set forth in the note 4, supra. Taxpayer claims that none of the specific tracts of timber sold during the taxable years in question

were held by taxpayer and his wife primarily for sale to customers in the ordinary course of business. In support of this contention taxpayer points to an average length of holding of each tract of about eight years, lack of "busy-ness" or affirmative activity on the part of petitioners in seeking to bring about such sale, and the fact that despite the tremendous increment in timber stumpage values, brought on by the wartime inflation, petitioners disposed of only a small percentage—between 3 and 8 percent—of their timber holdings during the taxable years in question, and still retained most of their timber, despite numerous offers. Taxpayer also points to the fact that petitioners had even more numerous transactions in the stock market during this time.

As stated in petitioners' opening brief, all other issues are relatively minor compared to the principal issue, which is whether petitioners realized capital gains or ordinary income from the sale of timber on certain tracts of timberland during the years 1950 through 1953. There appears to be no real dispute as to the facts. The Tax Court in dealing with the problem as to various transactions, which for the purposes of this particular question need not be specifically enumerated, pointed out, among other things, the following circumstances in support of its ruling that taxpayer was engaged in the business of acquiring and selling

---

Revenue Code of 1939, but that it was in payment for timberlands which the church deeded to the taxpayer in that year?

4. In this connection the Tax Court stated among other things, Transcript p. 169:

"What constitutes a trade or business is a question of fact. Many factors have been considered by the courts in the determination of this question, among them, the nature of the acquisition of the property, the frequency and continuity of transactions over a period of time as distinguished from isolated transactions, substantiality of transactions, and the activity of the seller with respect to the property. William E. Starke, 35 T.C. 18, 26 (1960) and cases there cited, on appeal (C.A.9, Jan. 19,

1961). Considering all the evidence herein and particularly the numerous sales made by petitioner, the high percentage of his total income derived from such sales, his own participation in the sales activity, and the lack of any other occupation which consumed a substantial portion of his working time, all as set forth in some detail in our findings, we hold that petitioner was engaged in the trade or business of selling timber during the taxable years here involved. Since none of the adjustments made by respondent involves sales of timberlands, it is unnecessary to pass on the question whether sales of timberlands were also a part of petitioner's trade or business in the years here involved."

timberlands or timber rights during the ten years from 1948 to 1957, which included the four years here in question, namely 1950 to 1953 inclusive:

1. Taxpayer began to purchase and sell real estate for his own account about 1926 and continued to acquire and sell real estate since that time.

2. In the late 1920's he commenced acquiring timberland and has continued to acquire such timberlands from that time throughout the taxable years involved, most of them being through tax delinquent and other tax sales.

3. About 1940 he began to sell some of his timber and has continued to sell some of his timber throughout the taxable years involved.

4. From the early 1940's throughout the years involved it has been his policy to purchase the timberland, sell the timber thereon, and retain the land, although there have been a very few occasional outright sales of land itself.

5. In 1950 taxpayer owned between 50,000 and 100,000 acres of timberland located in the states of Oregon, California and Washington, and in Canada.

6. In 1952 taxpayer owned approximately 35,000 acres, containing approximately 250 million feet of lumber in Lincoln County, Oregon.

7. During the years 1948 through 1957 taxpayer made at least 107 separate sales of timber, and some sales of land.

8. The timber and timberlands sold by taxpayer during this 10-year period were located in 20 different counties, in three different states, and the total sales ran from a low of 74,000 odd dollars in one year, to as high as 452,000 odd dollars a year, to a grand total for the 10-year period of almost two and a half million dollars.

9. Petitioner was listed in the alphabetical and classified sections of the Portland, Oregon, and Vancouver, Washington, telephone directories during the years 1931 to 1947 as being engaged in the real estate business.

10. During the taxable years involved taxpayer maintained an office in his home in Vancouver, Washington, and from time to time persons interested in purchasing timberland from him would come to this office to negotiate such purchases with him.

11. About 1950 taxpayer opened an office in Newport, Oregon, under the assumed name of Wineberg Timber Company, a sole proprietorship of taxpayer. At first the office of this company was located in the office of taxpayer's accountant, and later was moved to a separate location.

12. During the period April 1, 1952, to July, 1955, taxpayer employed a Mr. Moses as manager of his Newport, Oregon, office, operating under the name of Wineberg Timber Company, and on April 6, 1953, an assumed business name certificate under the name of Wineberg Timber Company was filed in Lincoln County, Oregon, showing the true names of the persons conducting this business to be taxpayer and Ellis W. Moses, and stating the business of the Wineberg Timber Company to be "to purchase, exchange, sell and otherwise deal in timber, timberlands, logs, lumber and other forest products, and to log and manufacture lumber and lumber products."

13. In addition to Moses, taxpayer employed in the Newport Office of Wineberg Timber Company, on a full-time basis, a secretary, an engineer cruiser named Dennison, a helper for Dennison, and an office manager.

14. Taxpayer also employed a timber-finder, Pauley, who did not work in the Newport office; and on occasions taxpayer also employed a Mr. Hendrickson; but ordinarily his dealings with Hendrickson consisted of the latter coming to him to arrange for the purchase of timber from taxpayer for other persons.

15. Moses' duties, while employed as manager of the Wineberg Timber Company, were to supervise petitioner's timber operations; be responsible for the management of the Wineberg Timber Company office; see that timber sold un-

der contract was paid for, cut and removed pursuant to the contract; handle inquiries from prospective purchasers concerning the availability of timber for sale, and transmit offers to purchase timber to taxpayer.

16. Sales of timber negotiated by Moses were subject to approval by taxpayer. Dennison's primary duties were to cruise and check petitioner's timber holdings and to check and run timber lines. Pauley's main duties were to locate and check timber tracts, acquire properties for rights of way, and acquire properties adjoining tracts of timberlands owned by petitioner.

17. Petitioner's office in Newport, Oregon, had a sign on the door reading "Wineberg Timber Company."

18. Wineberg Timber Company was also listed in the classified section of the Corvallis, Washington-and-vicinity telephone directory of October 1953, under the heading "timber and timberland companies."

19. The stationery of that company carried its title, location and telephone number.

20. While Moses was employed by petitioner his name was carried on the stationery as the general manager of the company.

21. Moses distributed business cards of the Wineberg Timber Company carrying his name as general manager thereof, with his business and home telephone numbers.

22. While Moses was employed by the Wineberg Timber Company petitioner advertised in the name of the company over the radio for the purchase of logged-over lands or timberlands but these radio advertisements did not advertise timber or timberlands for sale.

23. Persons engaged in the timber business in Lincoln County, Oregon, knew that petitioner bought and sold timber and timberlands.

24. Petitioner did not have a set price which he had placed on specific timber, but throughout the 1940's and 1950's pe-

titioner made sales of timber when he believed he had a prospective purchaser at a price he considered "the right price."

25. The returns filed by petitioners for each of the taxable years in question contained a schedule of income and expense, and some of the items listed under expense in each return were amounts spent by petitioner in maintaining the Wineberg Timber Company office at Newport, Oregon.

Petitioner, in some instances, would plant and reseed timberlands owned by him. As part of the reseeding program he practiced pest control, having poisoned pellets dropped by plane on the reseeded timberlands. Petitioner also attempted to acquire parcels of land adjoining land that he already owned in instances where such acquisition would be advantageous to natural reseeding of his timberlands.

27. The Tax Court's opinion lists five timber sales for 1950, six for 1951, four for 1952, and three for 1953, ranging in sales price from a low $500 to a high of $26,000 which that Court considered as sales, the income from which was denied capital gains treatment by the Court. The opinion also lists 39 other timber sales made during the same period as to which the petitioners retained an economic interest in the timber and the respondent allowed capital gains treatment under Section 117(k)(2), I.R.C.

28. Both the agreements involving the former group and those involving the latter group of sales mentioned in the preceding paragraph generally provided for the sale of standing timber and not of land, contained a time limit within which the buyer was permitted to cut and remove timber from the land on which it stood, and a limitation in the diameter of timber sold and to be removed, sometimes referred to as selective cutting. On occasions because of the selective cutting provision and petitioner's retention of title to the land, petitioner was able to sell timber from the same tract to several different purchasers, so that on occasions over a pe-

riod of a year or two petitioner would make as many as six separate sales of different types of lumber from the same tract. During the years involved petitioner's sales of timber frequently excluded peeler logs.

29. In addition the Tax Court opinion lists six transactions during the period in question for which petitioners accepted as payments from sales various amounts for unauthorized or trespass removals of timber from their land. These trespasses were either reported by the trespasser or discovered by petitioners' employees, and most of them were inadvertent, resulting from mistakes in dividing property lines. In each instance the land upon which the trespass had occurred was examined by persons employed by petitioner to determine the extent of the unauthorized cutting, and petitioner and the trespassing party, after negotiations, agreed upon the amount to be paid for the trespass. There were probably other similar trespasses not discovered by petitioner.

30. Under Oregon laws effective during the periods concerned, a trespasser is liable for treble damages for intentional cutting and removal of timber, and for double damages for unintentional trespass cutting and removal.

31. During the years involved petitioner owned stock in the Yaquina Bay Mills, Inc., a corporation engaged in the business of a planing mill, and petitioner also acquired other lumber mills from the owners thereof who had purchased timber from him and failed to meet their payments for the timber. During said years petitioner had a contract for sale of logs to Yaquina and certain mills to which he had sold or was selling timber.

32. The foregoing facts in the aggregate, together with other considerations noted by the Tax Court, clearly support the ruling of the Tax Court on Issue No. 1., that during the years in question petitioner was engaged in the trade or business of selling timber, and clearly distinguish the Starke [5] and other cases relied upon by petitioners.

In this connection, we agree with the reasoning of the Tax Court, under the facts of this case, (a) that the failure to advertise the timber and timberlands for *sale* during the years concerned is not controlling where it is clear that petitioner had available, and used, means for selling his timber without advertising in newspapers or putting up For Sale signs, or otherwise expressly advertising that he was holding timber for sale; (b) that the lack of affirmative evidence in behalf of petitioners, to show that any one of particular timber holdings sold during these taxable years was held by petitioner for some specific reason as an investment, is of substantial significance in the framework of the total picture presented by the facts,[6] and (c) that the length of time of holding—an average of some eight years here—is not conclusive, although in other contexts it has been held a significant factor in determining that the property sold had been held for investment.[6]

As to amounts received from the trespass cuttings of timber, we agree

---

5. The cases of Starke v. Commissioner, (9 Cir. 1963) 312 F.2d 608, and Austin v. Commissioner, (9 Cir. 1959) 263 F.2d 460, are heavily relied upon by petitioners. In each it was undisputed that the taxpayer had a prime full-time profession which he was actively pursuing as an attorney, and there was definitely less activity or "busy-ness" on the taxpayer's part in connection with the sale of real estate than in this case, where it could well be said that activities connected with the purchase of timberlands and the sale of timber accounted for the prime "busy-ness" of the taxpayer.

6. Transcript, p. 171: "There is no affirmative evidence with respect to any property which petitioner sold during the taxable years here involved to show that petitioner held it for some specific reason as an investment. The fact that petitioner followed a practice of selling the timber and retaining the timberland is some indication that some of his timberlands might have been held for investment, but the evidence does not show such to be the case as to any of the timber sales in the years here involved. There is no evidence of any particular instances in which petitioner refused to sell a property or treated one property

that since, as the Tax Court properly held, the taxpayer was engaged in holding these properties primarily for sale to customers in the ordinary course of his trade or business, the gains from such amounts received in lieu of payment for the timber itself were receipts by petitioner from the sale of properties held primarily for sale to customers in the ordinary course of his trade or business and the gain therefrom constitutes ordinary income. There is no evidence that, as to the property on which the trespass cuttings were committed, the taxpayer intended to hold them for any purpose different from that of the timber holdings which he sold.

## ISSUE NO. 2.

In the alternative, petitioner raises issue No. 2., in which he appears

to argue, in effect, that the Tax Court should have allowed the taxpayer capital gains treatment of the proceeds from all timber sales, regardless of whether the timber was held for investment or for sale in the regular course of the taxpayer's business.

The argument, which is difficult to follow, seems to be that (a) the amendment made by the Revenue Act of 1943, which added subsection (k) to the Internal Revenue Code and amended Section 17 (j) (1) to make specific reference to subsections (k) (1) and (k) (2), (b) as construed by petitioner in the light of that portion of Senate Report No. 627, 78th Congress, on H.R. 3687, dealing with "Timber Relief," [7] does away with the exclusionary provisions of subsections 117(a) and 117(j) which exclude from eligibility for capital gains treatment

as being in a class or category different from his other properties. The only evidence in this connection offered by petitioner was the testimony of petitioner, himself, that he acquired all the various properties held by him for investment purposes and that he owned some properties that he would be unwilling to sell at any price. Petitioner's actions in selling numerous tracts of timber in the years here involved indicate that his idea of holding his properties for investment is holding them for resale when he can find a customer willing to pay a price that he is willing to accept for the properties. This is not holding of property for investment. Curtis Co., 23 T.C. 740, 755 (1955), reversed on another issue, 232 F.2d 167 (C.A.3, 1956)."

7. From Senate Report No. 627, 78th Congress on H.R. 3687 (as quoted on Cum. Bull. 1944, 973 at p. 993): "Your committee is of the opinion that various timber owners are seriously handicapped under the Federal income and excess profits tax laws. The law discriminates against taxpayers who dispose of timber by cutting it as compared with those who sell timber outright. The income realized from the cutting of timber is now taxed as ordinary income at full income and excess profits tax rates and not at capital gain rates. In short, if the taxpayer cuts his own timber he loses the benefit of the capital gain rate which applies when he sells the same timber outright to another. Similarly, owners who sell

their timber on a so-called cutting contract under which the owner retains an economic interest in the property are held to have leased their property and are therefore not accorded under present law capital gains treatment of any increase in value realized over the depletion basis.

"In order to remedy this situation, it is proposed to amend the existing law as follows:

"If the taxpayer so elects upon his return, the cutting of timber during the year by the taxpayer who owns or has a contract right to cut such timber is treated as a sale or exchange of the timber cut during the year and such cut timber is considered property used in a trade or business of the taxpayer for the purpose of section 117(j) of the Internal Revenue Code provided the taxpayer has owned such timber or held such contract right for a period of more than six months prior to the beginning of such year. Where such an election is made, gain or loss to the taxpayer is recognized in an amount equal to the difference between the adjusted basis for depletion of such timber in the hands of the taxpayer and the fair market value of such timber. The fair market value is determined as of the first day of the taxable year in which the timber is cut.

"The election which is made is binding on the taxpayer with respect to all timber which he owns or which he has a contract right to cut and is also made binding for all subsequent years unless the Commissioner, upon the showing of

property held by the taxpayer primarily for sale in the ordinary course of his trade or business.

Petitioner contends that, if Congress had intended to allow capital gains *only to that portion of the class* of taxpayers who either cut their own timber or disposed of the timber by contract under which they retained an economic interest, *who were not dealers,* this purpose could have been fully accomplished by the addition of Section 117(k) *without any amendment* to Section 117(j); and that by adding to Section 117(j) the sentence,

"Such term [meaning property used in the trade or business] also includes timber * * * with respect to which subsection (k) (1) or (2) is applicable. * * *",

*without adding* also a *specific exclusion* at this point of *property held primarily for sale,* etc., as was done in Section 117 (a) (1) (B), and in the portion of Section 117(j) preceding the last quoted amendment, Congress indicated an intention to go further and to extend capital gains treatment to all proceeds of timber sales, whether the timber was held for investment or primarily for sale in the ordinary course of business.

This contention of the petitioner is made in this Court for the first time, as pointed out by respondent. However, even assuming that it was properly raised below, we have carefully considered the point and find it to be without merit.

Senate Report No. 627 as quoted in Note Number 7, supra, indicates no intent to prefer timber dealers over dealers in other real property interests or in other commodities. The first paragraph of the quoted excerpt indicates concern solely with the inequality of treatment between a taxpayer who *cut* his own timber and then sold or used it, and one who merely sold the timber outright.

The obvious intent in adding subsection (k), as indicated by a reading of the entire excerpt from Senate Report No. 627 quoted in Note Number 7, supra, was *not* to eliminate existing exclusions as to *dealers* in timber, but to *equalize* the *treatment between* (1) *non-dealers* who *sold their timber outright,* and (2) *non-dealers who cut their own timber* and then sold or used it. Section 117 (k) (2) was added to give the same treatment to *non-dealers* who sold timber to others under a lease or similar arrangement whereby they reserved an economic interest in the timber, as was given by Section 117(k) (1) to *non-dealers* who sold their timber outright.

It seems equally obvious from a reading of said excerpt from Senate Report No. 627, that by adding to Section 117 (j) (1) the penultimate sentence incorporating by reference, into the definition of "property used in the trade or business," "timber or coal with respect to which subsection (k) (1) or (2) is applicable * * *."[8] *without* specifically again excepting "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," Congress did not intend to render inapplicable to timber sales and disposals specifically covered by subsection (k) those portions of Sections 117 (a) (1) (A) or (B) and 117(j) (1) (B)

---

undue hardship, permits the taxpayer to revoke his election.

"If an owner of timber disposes of it under a contract by virtue of which he retains an economic interest in such timber, the amount received by such owner is to be treated in a similar manner.

"This latter provision will afford relief to those who have leased their property under a contract whereby they retain an economic interest in the timber and are not entitled under the present law to capital gains treatment because of that fact.

"The amendments made by your committee are effective as to taxable years beginning after December 31, 1943, except with respect to the amendment dealing with the owner who has leased his property and who retains an economic interest in the timber. The latter amendment is effective as if it were a part of the Internal Revenue Code and of each prior revenue law on the date of its enactment."

8. See Boeing v. United States (1951) 98 F.Supp. 581, 582–583, Note 4, 121 Ct.Cl.
9.

which excepted from capital gains treatment property held primarily for sale.

"Since this section [subsection 117] is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term 'capital assets' in § 117. * * *"

Corn Products Refining Co. v. Commissioner (1955) 350 U.S. 46, 52,[9] 76 S.Ct. 20, 24, 100 L.Ed. 29. The construction here adopted conforms to the general rule of construction just quoted. We find no error in the Tax Court's failure to adopt the construction of Sections 117(j) and 117(k) advanced in this petitioner's alternate contention.

The questions as to whether the gains under certain transactions were entitled to capital gains treatment under subsection 117(k) (2) because of the timber allegedly having been disposed of under types of contract by virtue of which the owner allegedly retained an economic interest in such timber, are disposed of infra, in our discussions of issues Nos. 4. and 5.

## ISSUE NO. 3.

Sec. 112(b) (1)[10] of the Code permits non-recognition of gain or loss if property "held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale * * *) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment." Petitioners contend that in this category of alleged exchanges of property the Tax Court should have included the MacInnis (Wren Planing Mill), Monroe Lumber Company, Springfield Plywood Corp., and Pritzlaff and Wilson, transactions.

It was contended by the respondent that these transactions did not constitute exchanges of property, but rather constituted outright sales of timber, a portion of the purchase price in each instance being discharged by the purchaser, at petitioner's direction, paying directly to a third party, from whom petitioner had agreed to purchase other property, the agreed price of such property.

Respondent further contended that even if the transactions were in fact partial exchanges of properties, the properties exchanged were not like properties, within the meaning of Section 112(b) (1). The Tax Court avoided deciding either of these contentions, yet sustained the respondent's determination by holding: (1) that there was nothing in the record to support a contention (although neither of the parties appears to have argued the point) that the properties transferred by petitioner in these transactions were held for productive use in its trade or business; that the property transferred in each instance was standing timber; and that while it might be argued that some of petitioner's timberlands were held for productive use under a reforestation program, such an argument is not applicable to mature timber; and (2) that petitioner's timber in each of the transactions was held by him primarily for sale to customers in the ordinary course of his trade or business, and not for investment, and therefore came within the express exclusion of the language of Section 112(b) (1) reading: "(not including stock in trade or other property held primarily for sale * * *)." Hence the Court held that the transactions resulted in recognizable gains.

Our affirmance of the Tax Court's ruling on Issue No. 1., sustains the Tax Court's ground No. 2., next above mentioned, for ruling against taxpayer on this Issue No. 3., namely, that the petitioner's timber in each of the transac-

---

9. See also Commissioner v. P. G. Lake, Inc. (1958) 356 U.S. 260, 265, 78 S.Ct. 691, 2 L.Ed.2d 743.

10. Quoted in Appendix.

tions in question was held by him primarily for sale to customers in the ordinary course of his trade or business. However, from a reading of the entire record, we have no doubt that the denial of tax-free exchange treatment to the transactions here in issue was justified also both upon the Tax Court's ground No. 1 above mentioned, and upon the further ground that, as contended by respondent, there were no bona fide exchanges.

### ISSUES NO. 4. and NO. 5.

█ There were some 39 other sales during the years 1950 through 1953 of timber in which taxpayer retained an economic interest and the Commissioner allowed capital gains treatment under Section 117(k) (2). These are unaffected by the Tax Court's rulings and not in issue on this appeal. However, the Tax Court found that none of the disputed sales, the gain from which it held to be ordinary income, qualified under Section 117(k) (2).

Petitioner claims error in this respect, contending that certain of these sales were disposals of timber under contracts, by virtue of which the owner retained an economic interest in such timber. These sales are (1) the November 10, 1952, sale to J. L. Ledgett, (2) the Monroe Lumber Company transaction covering the Kendall timber and (3) the Yaquina Bay Mills, Inc., and Cascadia Lumber Company transactions.

(1) As to the Ledgett sale, we agree with the Tax Court that the timber sold to Ledgett was at a fixed price; that there was no contingency which would vary that price or Ledgett's obligation to pay it, and that the petitioner was not to be credited with any part of the timber removed or share in any income or profit Ledgett might derive from the removal and sale of the timber. The contract as drawn provided for $20,000 deferred payment with interest to petitioner as the timber was developed and removed from the tract, without reference to its sale. Petitioner later, to accommodate Ledgett, agreed to accept payment as the timber was sold. We agree with the Tax Court

that this later agreement did not alter the fact that petitioner was not looking to the sale of the timber for his payments, and that the fact that petitioner could upon default elect to cancel the contract, was a provision for security of the deferred payments, and not the equivalent of the retention of an economic interest.

(2) The Monroe Lumber Company-Kendall tract transactions involved the following facts. An agreement of February 10, 1950, provided for the sale of timber from petitioners to Monroe Lumber Co. of (1) timber (hereinafter and in the Tax Court decision called the Lincoln County property) on land owned by petitioners in Lincoln County, Oregon, and (2) timber (hereinafter and in the Tax Court's decision called the Kendall timber) on a piece of land then owned by Kendall, if as and when purchased by petitioner; and further provided that "This contract will not apply to the Kendall property until such time as the Kendall timber is acquired by the seller," and that if the said "Kendall property is not acquired by the seller within three (3) years from the date of this contract, then at the option of the buyer the Kendall property shall be eliminated from this contract."

Some time between February 10, 1950, and September 30, 1951, the exact date of which is not disclosed by the record, taxpayer being unsuccessful in negotiations to purchase the Kendall timber which he had thought his brother-in-law Kendall had previously agreed to sell to taxpayer, Monroe Lumber Co. purchased the Kendall timber at taxpayer's suggestion for a total purchase price of $31,721. On September 30, 1951, Monroe Lumber Co. deeded the Kendall property to Wineberg pursuant to a Supplemental Agreement between petitioners and Monroe Lumber Co., dated September 13, 1951. This supplemental agreement recited the execution of the February 10, 1950, contract, recited that at the time the 1950 contract was entered into the parties had contemplated that the seller (taxpayer herein) would acquire the Kendall

timber for the benefit of both parties thereto, that Monroe Lumber Co. had acquired the timber in trust for the use and benefit of petitioner and further recited that all the timber on the Kendall property should be included in and considered a part of the timber sold by the contract of February 10, 1950. Respondent contended that with respect to the timber cut by Monroe Lumber Company on the Kendall tract petitioner had not held the timber for more than six months prior to the disposal thereof to the Monroe Lumber Company. As the Tax Court points out under Section 117(k) (2) I. R.C.1939, where timber is disposed of under a type of contract by virtue of which the owner retains an economic interest in such timber, it is required that the timber must have been held for more than six months prior to the disposal, and the Tax Court notes, and we agree, that this means that the date of disposal of the timber is the date the contract granting the cutting rights is entered into.

The Supplemental Agreement also recited that Monroe Lumber Co. had advanced for petitioner's benefit and paid to Kendall and others for said timber the said sum of $31,721; that the parties had now agreed that petitioner should reimburse Monroe in said amount and that Monroe should execute to petitioner a deed or deeds of all the timber on the Kendall property, with certain minor exceptions; that in consideration of the stated premises the Monroe Co. agreed to execute a deed or deeds to petitioner of all his interest in and to the down and standing merchantable timber located upon the Kendall property; that all timber on said property should be included and considered a part of the timber sold by seller to buyer under the timber contract of 1950, and that petitioner should agree that Monroe should charge petitioner's account with the said sum of $31,721 from monies due and to come due petitioner under the 1950 contract. This deduction was made and amounts in excess thereof for the cutting of timber on the Lincoln County property were paid by

Monroe to petitioner in 1951, 1952, and 1953 and reported by petitioners as long-term capital gain for the respective years.

The respondent allowed capital gain treatment with respect to the amount in excess of $31,721, but held that the petitioners realized an additional unreported capital gain of $31,721 from the Lincoln County timber cutting in the taxable year of 1951, representing the purchase price of the Kendall timber paid by Monroe and deducted from the stumpage amounts then due and owing to petitioner by Monroe for the Lincoln County timber. The Tax Court held that if the contract of February 10, 1950, is considered a disposal by petitioner of the Kendall timber, it is obvious that petitioner had not held the timber for six months. On the other hand the Tax Court held that if we accept petitioner's contention that he acquired the Kendall timber when Monroe acquired it for his use and benefit, and consider the disposal of the timber to be on September 13, 1951, the date of the Supplemental Agreement, there is no showing that the timber had been held by petitioner for over six months at the date of its disposal, since the record fails to disclose on what date between February 10, 1950, and September 13, 1951, Monroe acquired the timber for petitioner's use and benefit.

Thus, under the Tax Court's ruling, proof by taxpayer of one of the essentials for receiving the benefit of Section 117 (k) (2)—namely that the timber was "held for more than six months prior to such disposal" is lacking, even if the contract was one under which the seller retained an economic interest in the timber. On the other hand, to the petitioner's contention that, since he received the Kendall Timber in exchange for like property held for investment, the holding period of the Kendall tract timber became that of the property for which it was exchanged, the Tax Court ruled that petitioner likewise could not establish the benefits of Section 112(b) (1) because the Tax Court's holding that the property was held primarily for sale excluded

it from the benefits of Section 112(b)(1).

Accordingly the Tax Court sustained the respondent's determination that the gain from the sale of the Kendall timber was ordinary income for petitioner. We sustain the Tax Court both in its ruling that $31,721 was an unreported capital gain as to the Lincoln County property for the year 1951, and that all of the gain from the sale of the Kendall timber was ordinary income to petitioner.

■ With respect to the so-called production royalties from Yaquina Bay Mills, Inc., and Cascadia Lumber Co., the Tax Court sustained the respondent's contentions that petitioner had failed to prove that these production royalties were paid to petitioner by Cascadia Lumber Co. or Yaquina Bay Mills under the agreement between petitioner and those companies providing for payments with respect to lumber processed in their mills, and that petitioner had failed to establish that he had owned the timber, from which the lumber was processed, for a period of over six months. We affirm the ruling of the Tax Court reading as follows:

"There is attached to the agreement between petitioner and Yaquina Bay Mills, Inc., a list of properties covered by the agreement. However, the record is devoid of any evidence showing how long petitioner had held each of these properties or that the logs from which the lumber that was manufactured in the plants of Yaquina Bay Mills, Inc., and Cascadia Lumber Company came from any of these properties, or if any, from which. There is also no evidence to show petitioner's relationship with the contract or captive mills that produced many of the logs. For all the record shows the logs may have been the property of someone other than petitioner when they were delivered to the mills. Petitioner has failed to establish that the so-called production royalties are entitled to capital gains treatment under the provisions of section 117(k)

(2) of the Internal Revenue Code of 1939."

### ISSUE NO. 6.

■ Whether the Tax Court erred in holding that the taxpayer's sale of 675 shares of Yaquina Bay Mills stock in 1951 resulted in a short-term capital gain of $37,809 rather than a short-term capital loss of $10,000. •

Without reciting the complicated details of the transactions involved in this issue, we sustain the result reached by the Tax Court, summarized by it as follows:

"The sale of the stock [meaning the May 1951 sale, there having been an earlier sale of other shares not in dispute] to George E. Miller Lumber Company was made in May 1951. A contract subsequently entered into solely for its effect on petitioner's tax liability is totally devoid of any business purpose. Such a contract is so lacking in substance that to recognize it for determining the price paid for the various shares of stock would be to 'exalt artifice above reality.' Gregory v. Helvering, 293 U.S. 465 [55 S.Ct. 266, 79 L.Ed. 596] (1935). Petitioner in May 1951 sold 975 shares of stock of Yaquina Bay Mills, Inc., for $172,500 or an average price per share of $176.92. Three hundred of these shares had been held by petitioner for more than six months and the gain thereon was properly reported as long term capital gain. Six hundred seventy-five of these shares with a cost basis of $81,000 had been held by petitioner for less than 6 months and the gain thereon in the amount of $37,809 was short-term capital gain." (Transcript p. 190.)

### ISSUE NO. 7.

■ We also sustain the Tax Court's ruling in holding that an amount the taxpayer received in 1950 for the use of a road was rent for the granting of a 10-year lease, rather than proceeds from the sale of an interest in land, and was taxable when received. Hyde Park Real-

ty v. Commissioner, 211 F.2d 462 (C.A. 2, 1954) and Commissioner v. Lyon, 97 F.2d 70 (C.A. 9, 1938).

## ISSUE NO. 8.

▉ As to the issue of whether a payment of $5,000 made by petitioner dated January 8, 1953, in favor of the Sacred Heart Church was a charitable contribution to that church, we agree that the evidence is ample to sustain the conclusion of the Tax Court to the effect that taxpayer agreed to pay $5,000 to the church if he should be given preferential treatment in buying certain timber and timberlands; that he was given such preferential treatment in being selected purchaser of the property, so that the price which would otherwise have been charged for the timber and timberland was reduced by approximately $5,000 because of the payment denominated as a contribution, and that therefore the payment was not a charitable contribution under Section 23(o) (2) of the Code. While the Tax Court cited, as authority for its ruling on this point, Estate of O. J. Wardwell, 35 T.C. 433 (1960) then on appeal and since reversed in Wardwell's Estate v. Commissioner (8 Cir. 1962) 301 F.2d 632, the facts of the present case nevertheless distinguish it even from the Wardwell case and support the result reached by the Tax Court. We find the conclusion also supported by such cases as DeJong v. Commissioner (C.A. 9, 1962) 309 F.2d 373 and Commissioner v. Duberstein (1960) 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218.

Finding no error in the Tax Court's decision, we affirm the same in toto.

## APPENDIX
### INTERNAL REVENUE CODE OF 1939:
§ 22. Gross income.

(a) [as amended by Sec. 1 of the Public Salary Tax Act of 1939, c. 59, 53 Stat. 574] *General Definition.* "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including personal service as an officer or employee of a State, or any political subdivision

thereof, or any agency or instrumentality of any one or more of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *

\* \* \* \* \* \*

§ 23. Deductions from gross income.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \*

(o) *Charitable and Other Contributions.* In the case of an individual, contributions or gifts payment of which is made within the taxable year to or for the use of:

\* \* \* \* \* \*

(2) A corporation, trust, or community chest, fund, or foundation, created or organized in the United States or in any possession thereof or under the law of the United States or of any State or Territory or of any possession of the United States, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation. * * *

\* \* \* \* \* \*

§ 41. General rule

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but

if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. \* \* \*

§ 112. Recognition of gain or loss—

(a) *General rule.* Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

(b) *Exchanges Solely in Kind—*

(1) *Property held for productive use or investment.* No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

\* \* \* \* \*

§ 117. Capital gains and losses

(a) *Definitions.* As used in this chapter—

(1) [as amended by Sec. 210 (a), Revenue Act of 1950, c. 994, 64 Stat. 906] *Capital assets.* The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(B) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (*l*), or real property used in his trade or business.

\* \* \* \* \*

(2) [as amended by Sec. 150(a) (1), Revenue Act of 1942, c. 619, 56 Stat. 798 and Sec. 322(c) (2), Revenue Act of 1951, c. 521, 65 Stat. 452] *Short-term capital gain.* The term "short-term capital gain" means gain from the sale or exchange of a capital asset held for not more than 6 months, if and to the extent such gain is taken into account in computing gross income;

\* \* \* \* \*

(4) [as amended by Sec. 150 (a) (1), Revenue Act of 1942, supra, and Sec. 322(c) (2), Revenue Act of 1951, supra] *Long-term capital gain.* The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross [1] income;

\* \* \* \* \*

(j) [as added by Sec. 151(b) of the Revenue Act of 1942, supra, and amended by Sec. 127(b) of the Revenue Act of 1943, c. 63, 58 Stat. 21] *Gains and losses from involuntary conversion and from the sale or exchange of certain property used in the trade or business.*

(1) *Definition of property used in the trade or business.* For the purposes of this subsection, the term "property used in the trade or business" \* \* \* includes timber or coal [2] with respect to which subsection (k) (1) or (2) is applicable \* \* \*

---

1. For the taxable years 1950 and 1951 instead of the word "gross," the statute used the word "net."

2. "or coal" was added in 1952.

(2) *General rule.* If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. * * *

(k) [as added by Sec. 127(a), Revenue Act of 1943, supra, and as amended by Sec. 325(b) and (c), Revenue Act of 1951, supra] *Gain or loss in the case of timber or coal*

(1) If the taxpayer so elects upon his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than six months prior to the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. * * *

(2) In the case of the disposal of timber or coal (including lignite), held for more than 6 months prior to such disposal, by the owner thereof under any form or type of contract by virtue of which the owner retains an economic interest in such timber or coal, the difference between the amount received for such timber or coal and the adjusted depletion basis thereof shall be considered as though it were a gain or loss, as the case may be, upon the sale of such timber or coal. * * *