Clarence A. **LUCKEY** and Juanita F. Luckey, Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent.

No. 19130.

United States Court of Appeals
Ninth Circuit.

July 20, 1964.

Robert E. Tout, Stockton, Cal., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Edward L. Rogers, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before HAMLEY, Circuit Judge, MADDEN, Judge of the Court of Claims, and JERTBERG, Circuit Judge.

MADDEN, Judge:

The taxpayers have petitioned this court for review of a decision, adverse to them, of the Tax Court of the United States, reported in 41 T.C. 1. We have jurisdiction pursuant to Section 7482 of the Internal Revenue Code of 1954.

The petitioners, by a contract made in 1957, followed by deeds made on June 3, 1958, became the owners of several lots in a real estate development on the shore of Lake Tahoe. They sold two of the lots in 1958, and two in 1959, all at a substantial profit. In their tax returns for those years they reported these profits as capital gains and paid taxes accordingly. The Commissioner of Internal Revenue treated the profits as ordinary income and determined deficiencies accordingly. He did so because, he said, the petitioners were, in their acquisition of the lots, engaged in a "joint venture," and Section 735(a) (2) of the Internal Revenue Code of 1954 says that when a partner receives "inventory items" from a partnership in a distribution by the partnership, a profit made on the sale of the items within five years after receipt of them from the partnership is taxable as ordinary income. Section 761(a) of the Code says that a "joint venture" is a partnership, for the purpose of this tax provision.

The petitioners, insisting that they had not entered into a partnership nor any other sort of a joint venture, but had merely purchased some lots and later sold them at a profit, filed a petition in the Tax Court requesting a review of the Commissioner's determination. The Tax Court's decision was, as we have seen, adverse to the petitioners, and they now ask this court to reverse the decision of the Tax Court.

Stockton Garden Homes is a corporation having its offices in Stockton, California. It buys and subdivides land, builds houses on the land and sells the houses. It has four stockholders, Cheney, Fraser, Sievers and Berberian, each of whom owns one-fourth of its stock. Sievers is the president, and Cheney is the secretary, treasurer, and manager of the corporation's activities. In 1957 Cheney, having learned of land for sale on Lake Tahoe, an area which was becoming increasingly popular for summer homes and permanent residences, found that an 87 acre tract on the lake could be purchased for $360,000. He suggested to his three associates that they form a group to buy and subdivide the tract to make some money. He estimated that they would need $450,000, $360,000 to buy the tract and $90,000 for its initial development. They decided to form a group or syndicate of ten persons, each of whom would put up $45,000.

On July 3, 1957, the corporation's check for $10,000 was given to the owner of the land to tie up the property, and an escrow showing the owner as seller and the corporation as purchaser was open at a title company. The instructions to the escrow holder were that the corporation had the immediate right of entry for surveying purposes and that it was to receive a deed for the land if it paid the balance of $350,000 by October 1, 1957.

The taxpayer Luckey was an orthopedic surgeon in Stockton and was a neighbor of Fraser, one of the four stockholders in the corporation. Fraser asked Luckey if he wanted to take one of the one-tenth shares in the development, and Luckey assented. Only two other persons, other than the original four, joined in the transaction. They were Swift and Lincoln. There being only

seven participants, the other three interests were subsequently taken, in equal shares, by the original four persons, Cheney, Fraser, Sievers and Berberian, each of whom thus had a 17½ per cent interest, Luckey, Swift and Lincoln each having a 10 per cent interest.

Each of the seven participants signed an agreement with the corporation, which agreement referred to the corporation's contract to purchase the specified tract for $360,000, the estimated $90,000 cost of development, the participant's desire to advance $45,000 to be used for the purchase and development of the property on the understanding that the $45,000 was to be repaid by a conveyance of lake frontage lots as provided thereinafter and that the advance was to be evidenced by a "non-assignable, non-negotiable, non-interest bearing note" executed by the corporation. The agreement provided that if the land was not acquired under the escrow agreement the $45,000 would be returned to the participant.

The agreement further provided that after the title had been acquired by the corporation, the corporation would have the lake frontage part of the property subdivided into lake frontage lots, would determine the value of each such lot, and would assign to each participant lots having a value, as fixed by the corporation, of the amount of each participant's payment.

The agreements with the participants further provided that as to the remainder of the tract, not included in the lake frontage subdivision, the corporation should have the absolute right to sell it without development, or develop it and sell the lots.

The concluding paragraph, paragraph 9, of the agreements provided that the participant should be entitled to receive, if, as, and when all of the remaining property was disposed of by the corporation, 10 per cent of the resulting net profits, if any, from the sale thereof, after deduction of all debts and expenses incurred by the corporation with respect to its operations relating to the property, "it being the spirit and intention of this agreement that * * * [each participant] shall participate in the ultimate net profit, if any, on the ultimate disposition of said properties." The agreement further provided that the participants might be accorded the privilege, at the discretion of the corporation, of purchasing portions of said lots if, as, and when and under such terms and conditions as might be determined upon by the corporation.

A copy of the agreement was furnished to Dr. Luckey before he and his wife executed it. He consulted his lawyer and was told that paragraph 9, discussed above, was undesirable because it "inferred the possibility of a partnership." On September 9, 1957, at the signing of the proposed agreement, he objected to paragraph 9 and asked if it could be altered or deleted. Cheney advised him that this might be done if it could be done without affecting the rights and interests of the other participants. Dr. Luckey's lawyer was away at the time and he and his wife signed the agreement as it was written. He paid his $45,000 and received a note written in the terms hereinbefore described. During September, each of the other six participants paid in $45,000. Apparently at this time it was still hoped that three other participants would be found to make up the contemplated ten. As we have seen, this did not occur and the original four, Cheney, Fraser, Sievers and Berberian, later increased their participations to take up the remaining three shares.

The money paid in, $315,000, by the seven was not sufficient to pay for the land, to say nothing of the cost of developing the lake frontage lots. The corporation, on its note guaranteed by its four stockholders named above, borrowed $150,000 from a bank in Stockton and paid for and received its deed to the land. The arrangement with the corporation was that the corporation was to hold title to the land, do the developing and subdividing, and receive a fee or service charge of one per cent for all moneys

handled by it. The development was named the Skyland Subdivision. The development occurred, Dr. Luckey received seven lake front lots, and sold four of them during the tax years 1958 and 1959 at a profit. He urges that he simply bought them from the corporation, Stockton Garden Homes, from whom he received the deeds for the lots, and that his profit was capital gain. The Commissioner of Internal Revenue urges, and the Tax Court has held, that he received these lots in a distribution from a joint venture in which he participated, and that Section 735(a) (2) of the Internal Revenue Code of 1954 made his profit on the resale of the lots within five years after receiving them taxable as ordinary income.

We think the decision of the Tax Court was right. The evidence shows a pooling of the money of seven participants for the purpose of acquiring a specific tract of land in a promising location and developing it "to make some money." They placed the title to the land in the corporation for obvious reasons of convenience in making conveyances. They lodged extensive powers of management and decision in the corporation because the four stockholders in the corporation were all participants in the project of acquiring and developing the tract, and were experienced in such affairs. Dr. Luckey, an orthopedic surgeon, would have been of no use in the project except to furnish necessary capital. The corporation, Stockton Garden Homes, was known not to be the beneficial owner of the land because, although it allowed its credit, backed by the guaranty of its four stockholders, to become involved in the transaction, it was to receive nothing from the transaction except a one per cent service charge for the handling of the money. A corporation whose business it is to develop tracts, build houses on the tracts and sell them does not operate on the basis of a one per cent service charge for the money which passes through its hands.

What the participants in this project expected to receive, and did receive, for their contributions were developed, saleable lots, at cost, and worth more than cost. They did not expect to receive these bargains as a result of the benevolence of a corporation whose usual objective was to make a profit. They knew that they were to receive these bargains, if their expectations were realized, from themselves, from their own enterprise financed by their own capital, and managed by their associate Cheney.

The agreement into which each participant entered with the corporation lodged unusual powers of management and decision in the corporation. But the corporation was no inanimate stranger, it was four men who were their associates in their venture, and on whose experience and character they relied when they put their money into the venture. It was a trustee with large powers of management and decision. When Dr. Luckey, at the invitation of his neighbor Fraser, put his money into the venture, it was Fraser's skill and experience as a real estate developer, and his integrity, that Dr. Luckey relied on to make him some money.

There is a good deal of discussion in the briefs about the effect of paragraph 9 in the agreement of the participants with the corporation, the provision that each participant should share in the ultimate profit, if any, from the sale of the part of the 87 acre tract not subdivided into lake front lots. It seems to us plain from the entire arrangement that, even though there had been no paragraph 9, the status of the corporation as only a trustee and managing agent was so obvious that so long as there was land, or the proceeds of land, remaining undistributed to those whose capital had bought the land, it could belong to no one other than the participants, its equitable owners. In this view, if Dr. Luckey's associates had been willing, which they were not, to eliminate paragraph 9 from his agreement, or from all the agreements, the status of the participants as joint venturers would not have been affected.

There is a second question presented by the taxpayers' petition, i. e., whether

the Tax Court allocated a sufficient proportion of the taxpayers' cost to the lake front lots, the profit on the resale of which is here in question. The question is touched upon lightly in the petitioners' briefs, but their contention has no merit.

The decision of the Tax Court is right, and is affirmed.