DAVID FASKEN AND BARBARA T. FASKEN, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ESTATE OF INEZ G. FASKEN, DECEASED, DAVID FASKEN,
INDEPENDENT EXECUTOR, PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket Nos. 5823–77, 5824–77.   Filed January 25, 1979.

*Richard S. Brooks*, for the petitioners.
*John F. Dean*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes for 1974 as follows:

| Petitioner | Deficiency |
| --- | --- |
| David Fasken and Barbara T. Fasken | |
| Docket No. 5823–77 ................................... | $3,773.01 |
| Estate of Inez G. Fasken | |
| Docket No. 5824–77 ................................... | 1,119.65 |

The sole issue for decision is whether the consideration received by petitioners for granting four easements across their ranch property should be applied against their basis in their entire acreage or against their basis in only the portion of the acreage covered by the easements.

### FINDINGS OF FACT

Petitioners David Fasken and Barbara T. Fasken, husband and wife, were legal residents of Ross, Calif., when they filed their petition, and they filed a joint Federal income tax return for 1974. Petitioner David Fasken, executor of the Estate of Inez G. Fasken, deceased, filed a Federal fiduciary income tax return for the estate for 1974. Both returns were filed with the Director, Internal Revenue Service Center, Austin, Tex.

In 1974, petitioners David Fasken (hereinafter referred to as David) and the Estate of Inez G. Fasken (hereinafter the estate) held title in fee simple to 165,229.85 acres of contiguous land

located in Andrews, Ector, Midland, and Martin Counties, Tex., near the cities of Midland, Odessa, and Andrews. This property, known as the "C" ranch (the ranch), has been used since the 1880's for grazing livestock. From May 1, 1946, to the date of the trial, the land was leased to Foy Proctor (Proctor) for use as a cattle ranch.

The two most recent lease agreements with Proctor, one dated November 1, 1971, and the other dated November 1, 1976, provided that the "net acreage suitable for grazing purposes" was 160,681.21 acres, consisting of the ranch's entire acreage of 165,229.85 acres, less 4,548.64 acres which were:

rendered more or less unsuitable, unavailable or inaccessible for grazing purposes by reason of any and all roads; sites for camps, plants, pump stations, mineral production and industrial facilities of various kinds; oil operations; * * * and any and all uses and conditions now existing tending to limit the availability or suitability of said lands for grazing purposes.

In the area in which the ranch is located, one important factor in placing a value on ranchland is its carrying capacity (i.e., the number of livestock the land can support for grazing purposes). In 1946, the ranch's carrying capacity was approximately 20 animal units per section without supplemental feeding on a yearly basis. By 1974, the carrying capacity of the ranch had declined to approximately 15 animal units (with supplemental feeding) per section, or 42.667 acres to support one animal unit. Among the factors which, in general, affect the natural grass cover of land and, thus, its carrying capacity at any given time are the amount of rainfall, the extent of wind erosion, the kind of grass growing on the land, prior grazing practices, and prairie fires.

The ranch lies in the geological subprovince of the Permian Basin of Texas, known as the Midland Basin. For many years prior to 1974, petitioners were actively engaged in oil and gas exploration and exploitation on the ranch as lessors, optionors of lease rights, royalty owners, nonoperating working interest owners, and operating working interest owners. In 1974, there were approximately 500 producing oil and gas wells situated on the ranch in which petitioners owned varying interests, including full fee simple ownership of operated working interest properties, royalty interests reserved in leases, and undivided fee simple ownership subject to operation by others under contracts. Various undeveloped portions of the ranch were subject to oil

and gas leases or options to acquire oil and gas leases which require the lessee or optionee, as limitations upon the interest granted to him, to conduct geophysical exploration and drilling operations in search of oil and gas.

Prior to 1974, approximately 220 easements covering portions of the ranch had been granted by its owners. Most of those easements were placed on the land because of the oil operations. The larger share of the easements were for pipelines, roads, and power lines. In addition to the easements, the outstanding oil and gas leases covering the land entitle the lessees to burden the surface to the extent reasonably necessary to reduce the oil and gas reserves to possession.

The parties have stipulated that during 1974, David, individually and as executor of the estate, granted the following easements affecting the ranch:

(a) January 16, 1974, to Pioneer Natural Gas Company, an easement [hereinafter the Pioneer pipeline easement] for a pipeline for transmission of natural gas to be constructed along the Center Line of a strip of land 30 feet in width by 9,837.3 feet in length [totaling 6.775 acres] over Section 11, Block 40, T–1–S, T&P Ry. Co. Survey, Midland County, Texas, in consideration of $4,769.60 of which 75% or $3,577.20 inured to the benefit of David Fasken and 25% or $1,192.40 inured to the benefit of the Estate of Inez G. Fasken.

(b) February 6, 1974, to Mapco, Inc., an easement [hereinafter the Mapco pipeline easement] for a pipeline for transmission of petroleum products along the Center Line of a strip of land 30 feet in width by 36,484 feet in length [totaling approximately 25.127 acres] over Sections 26, 21, 22, 23, and 17, Block 40, T–2–N, T&P Ry. Co. Survey, and Sections 5, 12, 11, and 22, Block 41, T–2–N, G&MMB&A Survey, Andrews County, Texas, in consideration of $13,266.90 of which 75% or $9,950.18 inured to the benefit of David Fasken and 25% or $3,316.72 inured to the benefit of the Estate of Inez G. Fasken.

(c) June 25, 1974, to Arco Pipe Line Company, an easement [hereinafter the Arco easement] to install, maintain, and use two guy anchorages for a microwave communication tower, one such anchorage being situated in Section 14, and the other in Section 13, Block 41, T–2–N, G&MMB&A Survey, Andrews County, Texas [covering an area of approximately 1,100 square feet] in consideration of $250.00 of which 75% or $187.50 inured to the benefit of David Fasken and 25% or $62.50 inured to the benefit of the Estate of Inez G. Fasken.

(d) August 2, 1974, subsequently revised on or before March 6, 1975, to Mapco, Inc., an easement [hereinafter the Mapco cathodic easement] for installation of a Cathodic Protection Unit in the SW/4 of the SW/4 of Section 21, Block 40, T–2–N, T&P Ry. Co. Survey, Andrews County, Texas [covering an area not in excess of that covered by the Arco easement], consisting of an electric power line pole, rectifier, and appurtenances, a deep ground bed well, and underground cables from the rectifier to the ground bed and to Mapco's pipeline in consideration of $200.00 of which 75% or $150.00 inured to the

benefit of David Fasken and 25% or $50.00 inured to the benefit of the Estate of Inez G. Fasken.

The identical instruments granting the Pioneer pipeline easement and the Mapco pipeline easement contained the following material provisions:

This grant does not authorize * * * any other above ground facilities not hereinabove expressly specified, described and located.

*     *     *     *     *     *     *

Grantee, its successors and assigns, shall have the right to do whatever may be requisite for the enjoyment of the rights herein granted, including the right of clearing said right-of-way of timber and of ingress and egress to and from said tract of land for the purpose of laying, maintaining, repairing, renewing and removing said pipe line. Said right of ingress and egress shall be exercised, so far as reasonably feasible, over existing roads. In no event shall Grantee construct any road continuously along said pipe line easement. Grantee shall not grade, blade, scrape or otherwise level such easement with any bulldozer, maintainer, grader or other like equipment, except as may be necessary to back-fill the ditch; and Grantee shall back-fill the ditch in which such pipe line shall be buried to a smooth crownfill and shall dispose of all rock and other debris caused by excavation or otherwise, by burying same below plow depth or removing same from the premises. * * * Grantee shall reconstruct all fences which may be cut or removed by Grantee in the process of constructing, repairing, renewing or maintaining such pipe line. * * *

The respective grantees are required to pay all damages resulting from actionable negligence or from breach of the specific terms of this contract, and that Grantee will thereafter pay all damages resulting from actionable negligence or breach of the terms of this contract in connection with maintenance, operations, repair and removal of said pipe line.

Grantee agrees that the pipe line shall be buried a sufficient depth so as not to interfere with the cultivation of the land in said right-of-way, so far as said land can be cultivated without interfering with or impairing Grantee's rights thereunder.

The Arco easement and the Mapco cathodic easement gave the grantee the right of ingress and egress. In addition, Mapco agreed to pay a reasonable sum for any actual damage done to petitioners' "fences, pasture or buildings." Arco agreed to— "construct and maintain good and substantial fences and guard rails * * * . The purpose of the * * * fence being the prevention of passage to livestock and ranch vehicles beneath said guy wires until a vertical clearance of 10 ft. is provided."

The four easements could be assigned. In addition, they were to revert to David and the estate in the case of nonuse.

The four easements did not materially affect petitioners' oil and gas exploration and exploitation operations. Also, except for

the small fenced-off area used in connection with the Arco easement, cattle on the ranch had access to the land covered by the easements. After excavation for the pipelines placed on the Pioneer and Mapco easements, however, the land was left nearly barren of grass. Grasses which subsequently grew on these areas were of a low quality, not as suitable for grazing as the native grasses. Seeding of the easement areas was not successful.

The Pioneer pipeline easement is located in a part of Midland County with Midessa, Amarillo, and Simona soil types. The soil blowing hazard associated with these types of soil is moderate.

Approximately 72 percent of the Mapco pipeline easement crosses Kimbrough, Kimbrough-Slaughter, and Stegall soil types, which have only a slight chance of soil blowing. Approximately 23.5 percent of the easement crosses Blakeney, Ratliff, and Faskin soil types which have moderate soil blowing hazards. The remaining approximate 4.5 percent of the easement crosses the Triomas soil type which has a severe chance of soil blowing.

Both the Arco easement and the Mapco cathodic easement are located on Kimbrough soil.

Petitioners did not report as taxable income for 1974 any of the proceeds in the total amount of $18,486.50 received as consideration for granting the four easements to Pioneer, Arco, and Mapco. In the notices of deficiency, respondent determined that petitioners realized taxable gain in the amounts of $6,860.03 and $2,239.29 from the sale of a right-of-way (i.e., from the grants of the four easements). Those amounts were computed as follows:

|  | Petitioner David Fasken and Barbara T. Fasken | Estate of Inez G. Fasken |
| --- | --- | --- |
| Sale of right-of-way | $13,864.88 | $4,621.62 |
| Less: Basis | 144.82 | 143.04 |
| Total long-term gain | 13,720.06 | 4,478.58 |
| Less: I.R.C. sec. 1202[1] deduction | 6,860.03 | 2,239.29 |
| Taxable gain | 6,860.03 | 2,239.29 |

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

OPINION

Petitioners own approximately 165,000 acres of west Texas ranchland on which are located some 500 producing oil or gas wells. Prior to 1974, the year in controversy, they had granted approximately 220 separate easements for the construction of oil and gas pipelines, electric power lines, and other facilities on their property. In addition, each oil and gas lease covering portions of their land gave the lessee rights of ingress and egress for exploration and exploitation purposes. The issue here to be decided is whether, as contended by petitioners, the consideration petitioners received for the grant of four additional easements in 1974 should be applied against petitioners' adjusted basis for the entire ranch or, as contended by respondent, against that portion of the adjusted basis properly allocable to the land covered by the easements.

Section 61(a)(3) defines gross income to include "Gains derived from dealings in property."[2] The regulation, sec. 1.61–6(a), Income Tax Regs., interpreting this section states generally that "gain is the excess of the amount realized over the unrecovered cost or other basis for the property sold or exchanged," adding:

When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts, and the gain realized or loss sustained on the part of the entire property sold is the difference between the selling price and the cost or other basis allocated to such part. The sale of each part is treated as a separate transaction and gain or loss shall be computed separately on each part. Thus, gain or loss shall be determined at the time of sale of each part and not deferred until the entire property has been disposed of.

We think the principle of this regulation requires an allocation of a portion of petitioners' adjusted basis in the ranch to the easement rights which were sold and that the consideration received for the easements in excess of such allocable portion of the ranch's adjusted basis is taxable to petitioners as capital gain. Accordingly, we hold for respondent.

Petitioners are no doubt correct in their view that this

---

[2] Sec. 1001(a) provides:

SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

regulation focuses mainly on sales of real property which involve a "vertical or horizontal severance of the realty into two or more parcels." It is established beyond cavil that the basis for each such severed portion must be computed and the gain calculated on the sale of such portion. *Luckey v. Commissioner*, 41 T.C. 1, 12 (1963), affd. 334 F.2d 719 (9th Cir. 1964); *Cleveland-Sandusky Brewing Corp. v. Commissioner*, 30 T.C. 539, 544–545 (1958). But the principle which the regulation states is not limited to the subdivision of real property. "Ownership of property is not a single indivisible concept but a collection or bundle of rights with respect to the property." *Merrill v. Commissioner*, 40 T.C. 66, 74 (1963), affd. per curiam 336 F.2d 771 (9th Cir. 1964); *Hoven v. Commissioner*, 56 T.C. 50, 55 (1971). The easement rights which petitioners granted to Pioneer, Arco, and Mapco were part of that bundle of rights comprising petitioners' interest in the ranch; such rights were interests in the land. *Anderson v. Tall Timbers Corp.*, 378 S.W.2d 16, 23 (Tex. 1964); *Reeves v. Arkansas-Louisiana Gas Co.*, 553 S.W.2d 19, 20 (Tex. Civ. App. 1977); *Union Properties Co. v. Klein*, 333 S.W.2d 864, 867 (Tex. Civ. App. 1960). The granting of those easements constituted a disposition of such interests.[3] See *National Memorial Park v. Commissioner*, 145 F.2d 1008, 1014 (4th Cir. 1944), affg. a Memorandum Opinion of this Court, cert. denied 324 U.S. 858 (1945); cf. *Ray v. Commissioner*, 18 T.C. 438, 441 (1952), affd. 210 F.2d 390 (5th Cir. 1954), cert. denied 348 U.S. 829 (1954); *Commissioner v. Plestcheeff*, 100 F.2d 62, 64 (9th Cir. 1938). The principle underlying the above-quoted regulation, therefore, applies here.

Accordingly, as provided in the regulation, where property is acquired for a lump sum and interests therein are subsequently disposed of separately, in order to compute the gain or loss from

---

[3]In this connection, petitioners point out that the easements in question are subject to reversion for nonuse and seem to argue that the grants of such easements were not sales. Capital gain treatment is allowed under sec. 1222(3) or 1231(a) only where there has been a sale or exchange. *Dobson v. Commissioner*, 321 U.S. 231, 232 (1944); *Pounds v. United States*, 372 F.2d 342, 348–351 (5th Cir. 1967); sec. 1.1231–1(c)(1), Income Tax Regs. If the transactions were not sales or exchanges of interests in land within the meaning of those sections, the "grants" presumably were licenses or leases, and in such circumstances the consideration petitioners received would be taxable as ordinary income. Cf. *Vest v. Commissioner*, 481 F.2d 238, 245–246 (5th Cir. 1973), affg. on this issue 57 T.C. 128 (1971), cert. denied 414 U.S. 1092 (1973); *Wineberg v. Commissioner*, 326 F.2d 157, 169–170 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; *Nay v. Commissioner*, 19 T.C. 114, 119 (1952). Since respondent determined that petitioners realized capital gain on the transactions and does not here contend otherwise, we accept his determination that the transactions were sales of the easement rights, but we express no view on the correctness of that determination.

each disposition an allocation or apportionment of the cost or other basis to the several units must be made. Unless such an apportionment of the basis is impossible or impracticable, the gain is then computed and reported on the disposition of each part. See *Inaja Land Co., Ltd. v. Commissioner*, 9 T.C. 727, 735 (1947); *Blum v. Commissioner*, 5 T.C. 702, 709 (1945).[4] If a rational apportionment of the basis to the interest sold cannot be made, the consideration received on the sale may be credited against the basis for the entire property. *Inaja Land Co., Ltd. v. Commissioner, supra; Scales v. Commissioner*, 10 B.T.A. 1024, 1031 (1928).

Whether apportionment of a definite basis to the property affected by the easement grant reasonably cannot be made is an issue of fact on which petitioners have the burden of proof. We do not think they have carried that burden in the instant case.

The parties agree that the surface of the ranch is valuable or useable primarily for cattle ranching and that it continued to be useable and was so used after the easements were granted. Petitioners maintain, however, that the grantees' use of the easements affects not only the areas covered by them but also affects substantial additional areas. Thus, the grantees use roads not within the boundaries of the easements to service the facilities located on the easements, and such use disturbs the use of the ranch as a whole. The native grasses were destroyed in laying the pipelines and constructing the other facilities, and this loss of ground cover has resulted in wind erosion. The new grasses which have grown on the easement areas are not as nutritious or otherwise as desirable for grazing cattle as the native grasses. The result, according to petitioners, is that the number of cattle per section that the land will support has decreased measurably.

From the evidence before us, we are not convinced that a

---

[4]See also *Wroblewski v. Commissioner*, T.C. Memo. 1973–37. Petitioners cite three district court cases which, they argue, support an opposite conclusion. In those cases, the district courts filed findings of fact and conclusions of law without explaining the rationale of their holdings. In two of the cases, *Conway v. United States*, an unreported case (W.D. Ky. 1973, 31 AFTR2d 73–1028, 73–1029, 73–1 USTC par. 9318) and *Bledsoe v. United States*, an unreported case (N.D Okla. 1967, 20 AFTR2d 5282, 5283, 67–2 USTC par. 9581), the district courts stated the transactions were not sales of land. Compare the cases cited in n. 3 *supra*. Nonetheless, these courts permitted the grantors of the easements to apply the proceeds to the reduction of their basis in the remaining tracts. The same result was reached in *Watts v. Erickson*, an unreported case (D. Ore. 1962, 10 AFTR2d 5832, 5836, 62–2 USTC par. 9778), although the court stated that there was a sale of property. The rationale of those opinions is not entirely clear from the published findings of fact and conclusions of law.

reasonable allocation of a portion of the ranch's total basis to the easement areas cannot be made. We are not satisfied that the easements across petitioners' land have contributed substantially to the reduction in the cattle carrying capacity of the land. The ranch is located in an area where the annual rainfall is only about 13.9 inches, and grass production is normally sparse. According to studies by the United States Department of Agriculture, which were introduced in evidence, the native grasses have been heavily grazed for several generations and, as a result a high percentage of the most desirable grasses have been grazed out.[5] Thus, the reduction in the land's cattle carrying capacity is attributable to past overgrazing rather than to the easements.

Wind erosion in the ranch area of west Texas is a problem. The testimony, based on the Department of Agriculture studies, however, shows that the Arco and Mapco cathodic easements and 72 percent of the Mapco pipeline easement are located on soil with only a slight chance of blowing, and approximately 23 percent of the Mapco pipeline easement crossed soil with a moderate chance of blowing. On only 4.5 percent of this latter easement was there a severe chance of soil blowing. We are not convinced, therefore, that the disturbance of the ground cover during the installation of the pipeline and other facilities on the easement areas contributed materially to the wind erosion on lands not covered by the easements. Indeed, one of petitioners' witnesses testified that the blowing of the caliche used to cover the roads in that part of west Texas accounts for most of the grass damaging wind erosion in the area. The grantees of the easements here in dispute were not permitted to construct roads.

The evidence does not convince us that the cattle carrying capacity of petitioners' land is substantially affected by the easements. Except for the small fenced-off area used in connection with the Arco easement, cattle can cross the easements for grazing or obtaining water. No doubt the grass

---

[5]Soil Survey of Andrews County, Texas (Dept. of Agriculture, August 1974), p. 19:

"The native grassland has been heavily grazed for several generations. As a result, a high percentage of the more desirable grasses and forbs have been grazed out. This has permitted less desirable grasses, weeds, and brush to invade."

Soil Survey of Midland County, Texas (Dept. of Agriculture, April 1973), p. 17:

"Most native grasslands of Midland County have been heavily grazed for several generations, and their original plant cover has been altered."

and other vegetation now growing on the easement sites is less desirable for grazing than the native grasses. But petitioners were well paid for the easements,[6] and the evidence simply does not establish that any substantial additional land was rendered unusable for grazing purposes. Certainly, it cannot be said that the grant of the easements in issue materially affected the use of petitioners' property as a whole for ranching purposes.

Indeed, petitioners have continued to lease their ranchland for grazing purposes for many years despite the numerous easements granted in connection with the extensive oil development carried out on it. Leases covering the ranch were executed in 1971 and 1976, before and after the easements here in question were granted. These leases each contain a provision, quoted in our findings, which states that 4,548.64 acres of the total acreage of 165,229.85 were "unsuitable, unavailable or inaccessible for grazing purposes" by reason of the location of mineral production and industrial facilities of various kinds. The same figure for unsuitable acreage is used in both leases without any adjustment for the 1974 easements here in dispute.

Petitioners also argue that the Pioneer pipeline easement, which was located approximately 7 miles from the center of the City of Midland, adversely affected the potential use of a portion of the ranch as a subdivision. Petitioners have failed to prove this point. Their witness, Wayne Austin, a real estate appraiser, testified in general terms that the easement would have a detrimental effect on the value of the adjacent acreage because the easement creates problems in planning the layout of streets and utilities. Other testimony shows, however, that the pipeline is installed a sufficient distance from the section lines to permit street construction without crossing the easement. Moreover, the testimony shows that, because of Midland's growth pattern, it will be a long time before the area covered by the easement has any real subdivision possibilities.

The cases on which petitioners rely are clearly distinguishable. In *Scales v. Commissioner*, 10 B.T.A. 1024, 1031 (1928), the

---

[6]For the Pioneer pipeline easement of 6.775 acres, petitioners received $4,769.60 or $704 per acre. For the 25.127 acres covered by the Mapco pipeline easement, petitioners received $13,266.90 or about $528 per acre; for the 1,100 square feet covered by the two Arco guy anchorage easements, petitioners received $250; and for the Mapco cathodic easement, they received $200. According to information in the record, these prices on a per-acre basis equaled or exceeded the fair market value of a fee simple interest in similar ranchland and a return equal to prevailing interest rates on the proceeds of the sale of those easements exceeds the value of the easement areas for grazing purposes.

taxpayer granted a perpetual easement and right-of-way and as a result was deprived of practically all beneficial interest in 324.4 acres of land, and the land became "useless for purposes of cultivation or grazing because almost always overflowed by water." The Board of Tax Appeals found that the taxpayer was left only with bare legal title which he could not sell for anything of value. Similarly, in *Inaja Land Co., Ltd. v. Commissioner*, 9 T.C. 727 (1947), the taxpayer conveyed to the city of Los Angeles a right-of-way and certain easements to divert foreign waters into the Owens River as it flowed through petitioner's land. The flow of the water was expected to change the course of the river, and the extent of the flood was not predictable. In both of these cases it was concluded that it would be impracticable or impossible to apportion a definite basis to the easements involved.

In the instant case, the usefulness of the ranch as a whole is not affected by the easement grants. The easements are described by metes and bounds, and the areas covered by the easements are clearly defined. The only land directly affected by the use of the easements is within their metes and bounds.[7] Petitioners continued to lease the same acreage for ranching purposes as they did before the easements were granted. The *Scales* and *Inaja Land Co.* cases are, therefore, clearly distinguishable.

We hold that petitioners have not shown that respondent erred in his computations of the amount of the capital gain realized on the easement grants except in one respect. The deficiency notices did not allocate any basis to the Arco easement and the Mapco cathodic easement, and an appropriate allocation of basis pursuant to the principles discussed herein should be made in respect of those easements.[8] To permit that allocation and to reflect other adjustments,

*Decisions will be entered under Rule 155.*

---

[7]We recognize that the conveyances conferred rights of ingress and egress over other land for the purpose of facilitating the use of the easements. However, we find that these rights were relatively insignificant in their effect on petitioners' continued use of the ranch.

[8]Assuming the correctness of the conclusion reached above that a portion of petitioners' adjusted basis for the ranch should be allocated to the easement rights conveyed to the grantees, petitioners have raised no question as to the correctness of the formula used by respondent in making the allocation, and we do not pass on the correctness of that formula.