T.C. Memo. 2011-178


UNITED STATES TAX COURT


LAWRENCE L. WICKERSHAM, DECEASED,[1] AND MARY J. WICKERSHAM,
Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 25785-08.                    Filed July 28, 2011.


<u>James R. Monroe</u> and <u>Jerrold A. Wanek</u>, for petitioners.

<u>Stephen A. Haller</u>, for respondent.


---

[1]Petitioners' counsel notified the Court that petitioner
Lawrence Wickersham died after the trial, on Feb. 21, 2011.
Petitioners' counsel indicated that no estate will be opened
because all of his assets transferred to petitioner Mary
Wickersham upon his death.  We changed the caption accordingly.

MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, Judge:  Respondent determined a $98,201 deficiency in petitioners' Federal income tax and a $19,640[2] accuracy-related penalty under section 6662(a)[3] for 2005 regarding petitioners' sale of certain assets in that year.  We are asked to decide the proper tax treatment of petitioners' sales of interests in their home and towing business, located on a 5-acre parcel on Interstate 80 near a major intersection.  One such sale was to Glen and Susan Mikel (the Mikels), and the other was of a permanent easement to Polk County, Iowa (Polk County).  Resolving these issues depends on the proper allocation of basis and sale proceeds to distinct portions of the property.  We are also asked to decide whether petitioners are subject to the accuracy-related penalty under section 6662(a).  We determine the taxability of assets sold to the Mikels and to Polk County, and find petitioners are not liable for the penalty.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and the accompanying exhibits are

---

[2]All amounts are rounded to the nearest dollar.

[3]All section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

incorporated by this reference. Petitioners resided in Colfax, Iowa at the time they filed the petition.

Petitioners, both in their second marriage, were married for 35 years at the time of trial. Mr. Wickersham had a towing business in Iowa and Mrs. Wickersham helped him with the business during their 35-year marriage. She has an eighth-grade level of education. Petitioners have seven children and 23 grandchildren. Six of their children and 22 of their grandchildren live in the Des Moines, Iowa area.

## I. The Property and the Easement

When first married, petitioners operated the towing business, called I-80 Towing, from their farmhouse. Petitioners acquired a nearby cornfield, consisting of five acres. Petitioners borrowed funds to acquire the cornfield. Mrs. Wickersham entered into a real estate contract for the five acres of farm land in Bondurant, Iowa (the property) in 1986 for $105,000. Mrs. Wickersham received title to the property in January 2000.

Petitioners originally put a trailer house on the property. As the towing business improved, petitioners dug a basement, put a pre-fabricated residence on the property and resided there. They improved the house by adding a garage, a water system and a large party room. They operated the towing business from a building they constructed on part of the property.

The house is located on the north side of the property and the business structure is located on the south side.  A horseshoe driveway connects these structures and provides two separate accesses.  Petitioners used the land between the residence and the business structure to store personal property and to shelter their Saint Bernard dogs.

The Mikels owned a competing towing business and sought to acquire petitioners' towing business and the five-acre parcel. The Mikels could not afford, however, to purchase it outright at the time.  Petitioners agreed to lease the business portion of the property to the Mikels for a 5-year term starting September 2000.  The Mikels' lease included an option to purchase the towing business and the property including petitioners' home (the purchase option) at the end of the 5-year lease term. Petitioners and the Mikels agreed that the $950,000 purchase option would be allocated as follows:

| | |
|---|---|
| Towing business name | $25,000 |
| Goodwill | 25,000 |
| Residential property / building | 150,000 |
| Commercial property / building | 100,000 |
| Land | 615,000 |
| Equipment and supplies | 10,000 |
| 1987 Volvo Wrecker | 25,000 |
| **TOTAL** | **$950,000** |

They further agreed that rent payments made during the term of the lease would be applied to the purchase price.

Petitioners did not lease the residential portion of the property to the Mikels. Instead, petitioners continued to reside in the house. They lived in the main portion of the house and, for a period of time, petitioners' son and daughter-in-law resided in the house's basement.

The Public Works Department of Polk County began a road improvement project during the lease term. Polk County sought to acquire all or part of the property to widen the road. Petitioners initially refused to grant or sell an easement to Polk County. After negotiations, Polk County threatened to condemn the front portion of the property if petitioners did not grant the easement.

Petitioners granted Polk County an easement on the front portion of the property, which was subject to the Mikels' lease, for $165,208 in January 2005.[4] Polk County primarily sought to purchase, and did acquire, a permanent right-of-way easement for use as a public highway. The sales contract provides that an existing sign (presumably for I-80 Towing) could remain on the

---

[4]The sale price of the easement was allocated as follows:

| | |
|---|---|
| Permanent easement (1.28 acres) | $131,000 |
| Temporary easement | 5,100 |
| New fence | 1,040 |
| Abstracting fees/general damages | 20,000 |
| Corner posts | 168 |

land.  Petitioners had to remove, however, all trailers, vehicles and other objects on the right of way.  In their return for 2005, petitioners reduced their basis in the property by $160,108 attributable to the easement.

The Mikels notified petitioners in 2005 they intended to exercise the purchase option.  Petitioners began to pack and move their possessions.  The Mikels' business, G & S Service, purchased the property and the towing business in October 2005, subject to the permanent easement granted to Polk County.  The Mikels subtracted $150,000 in rents and $131,000 for 1.28 acres attributable to the permanent easement granted to Polk County from the purchase option price, to reach a total sale price of $669,000.

II. Orchard, Nebraska

Mrs. Wickersham purchased a dance hall and bar (Utter Place) in Orchard, Nebraska in March 1999, a year and a half before leasing the towing business to the Mikels.  Her brother-in-law and his girlfriend sought to sell Utter Place, and offered it to petitioners for $10,000.  Utter Place was approximately five hours or 305 miles from the property.

Mrs. Wickersham applied for a liquor license for Utter Place in 1999.  Nebraska liquor licenses are issued only to Nebraska residents.  Mrs. Wickersham's application showed her address as a post office box in Orchard, Nebraska.  She renewed the liquor license yearly.

Petitioners opened Utter Place for occasional private parties starting in February 2000.  Petitioners traveled to Nebraska an average of once per month from 2000 through 2005 for parties at Utter Place.  Petitioners had hoped that Utter Place would pay for itself.  Utter Place was generally not a profitable operation, however, and petitioners reported either a very small net profit or a net loss yearly from 2000 through 2005.

Petitioners purchased two dwellings in Nebraska, in 2000 and 2001, one of which was located immediately behind Utter Place.

III. Events, Medical Care and Items in Iowa

Petitioners spent significant amounts of time in Iowa despite having a business in Nebraska.  They were never gone from Iowa for an extended period.  While in Iowa, they resided at the property.

Petitioners used the house as the family's home.  They hosted 15 to 20 familial parties each year.  They celebrated holidays and birthdays with their six children and 22 grandchildren in Iowa.  Mrs. Wickersham helped her children in Iowa with personal needs, such as moving and medical care.  She babysat for her grandchildren, sometimes for extended periods.  Petitioners did their holiday shopping, paid their insurance bills and purchased their many vehicles in Iowa.  They attended their son's car races in Iowa, as well as the yearly 10-day Iowa State Fair.

Mr. Wickersham was diagnosed with throat cancer in December 2001 in Iowa. After a month of testing, Mr. Wickersham had throat surgery in Iowa. After the surgery scars healed, he received 36 radiation treatments. He received all treatments in Iowa. The radiation treatments lasted until at least April 2002. Mr. Wickersham also had hernia surgery in Iowa in August 2004.

IV. Taxes and Documentation

Petitioners held Iowa driver's licenses during the 5-year term of the Mikels' lease. Their service-providers, including doctors, lawyers and bookkeepers, were located in Iowa. They claimed homestead tax credits with respect to the property for 2000 through 2005, which they could legally do only as Iowa residents. Petitioners' many vehicles were all registered, licensed and located in Iowa except for one. Petitioners received mail, including physicians' bills and bank statements, in both Iowa and Nebraska. Their credit card statements were mailed to the property in Iowa. Neither petitioner ever registered to vote in either state.

Petitioners' Federal and Iowa State income tax returns for 2000 listed an Iowa address. The returns for 2001 through 2004 listed an address in Nebraska. Petitioners filed Nebraska State tax returns for 2002 and 2003 as residents using a Nebraska address. They did not file a Nebraska State tax return for 2000, 2001, 2004 or 2005. Petitioners' Federal income tax return for 2005 listed an Iowa address.

Petitioners did not prepare their returns. They reviewed them only to note what they owed and to sign them. Petitioners' daughter organized their tax information and took it to Barbara Walston (Ms. Walston) to prepare. Petitioners paid Ms. Walston to prepare the returns for 2000 through 2004. Petitioners' daughter or attorney then picked up the returns and delivered them to petitioners at the property. Petitioners never met with Ms. Walston.

Petitioners' longtime attorney introduced them to another tax preparer for 2005. Linda Harris (Ms. Harris) advised them on the sale of the property to the Mikels and prepared the return for 2005. Ms. Harris is an enrolled agent with the Internal Revenue Service (IRS). Her firm prepares approximately 1,300 tax returns each year. Petitioners did not know that Ms. Harris had never prepared a return as complex as the return for 2005.

Ms. Harris spoke with petitioners to prepare the return and believed she had all of the information necessary. Ms. Harris rarely had any issues with the IRS on returns she prepared. She received feedback from the IRS only on fewer than 100 returns in 22 years of preparing returns. The IRS audited fewer than 25 of the returns she prepared. Adjustments were made to only two returns from those audits. Petitioners' return for 2005 was one. Ms. Harris paid the $1,000 tax return preparer penalty assessed for her errors in preparing the return for 2005. This is the only return preparer penalty assessed against Ms. Harris.

V. <u>Subsequent Events</u>

Petitioners purchased a new personal residence in Colfax, Iowa in October 2005.

Respondent's deficiency notice to petitioners determined the deficiency and accuracy-related penalty against petitioners with respect to the sale of certain business assets, the easement sale and the sale of the property to the Mikels. Petitioners timely filed a petition.

OPINION

We must decide the proper tax treatment of petitioners' sales in 2005. The first sale was of the towing business, located on Interstate 80, including real estate upon which some business property and petitioners' house were located. The second sale was of the permanent easement petitioners sold to Polk County. We also must decide whether petitioners are subject to the accuracy-related penalty under section 6662(a). We must determine the proper allocation to basis of the respective portions as well as the proper allocation of the sales price to the respective portions.[5]

We begin with the burden of proof. The taxpayer generally bears the burden of proving the Commissioner's determinations are erroneous. Rule 142(a). The burden of proof may shift to the

_____

[5]Petitioners and respondent have both changed their views from the original positions stated in petitioners' tax return and the deficiency notice. They have subsequently made agreed upon calculations and allocations.

Commissioner if the taxpayer satisfies certain conditions. Sec. 7491(a). Our resolution of the issues is based on the preponderance of the evidence, not on the allocation of the burden of proof. Therefore, we need not consider whether section 7491(a) would apply. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005). We turn now to petitioners' sales of certain assets.

## I. Sale of Business Assets

Petitioners sold the towing business located on the property to the Mikels. Gain realized upon the disposition of property must be recognized unless an exception applies. Sec. 1001(c). The amount of gain realized is the excess of the amount realized over the taxpayer's adjusted basis in the property. Sec. 1001(a). The amount realized is the sum of any money received plus the fair market value of the property received. Sec. 1001(b).

Petitioners and the Mikels allocated the purchase price among the various business assets the Mikels were to acquire when they exercised the purchase option. The purchase option specified $10,000 for the equipment and supplies and $25,000 for the wrecker. The $950,000 purchase price was reduced, however, by $150,000 in rent payments. This 15.79-percent purchase price reduction allocated among the acquired assets reduces the purchase price of the equipment and supplies to $8,421 and the wrecker to $21,053.

The parties agree that the equipment and supplies had a zero adjusted basis and the wrecker had a $4,099 adjusted basis. Therefore, we subtract adjusted basis from the purchase price to find that petitioners' gain realized on the sale of the equipment and supplies was $8,421 and for the wrecker was $16,954. Petitioners and respondent agree that the gain recognized is ordinary income. Secs. 1221, 1231, 1245. Accordingly, petitioners had ordinary income of $25,375 from the sale of the equipment and supplies and the wrecker.

## II. Treatment of the Easement Sale

We next consider petitioners' easement sale to Polk County. We must decide this matter before we consider sales of the rest of the real estate including petitioners' interests in the property. Petitioners' permanent easement grant is a disposition of a partial interest in property and therefore a realization event. See sec. 1.61-6(a), Income Tax Regs; Rev. Rul. 72-255, 1972-1 C.B. 221. The sale of a perpetual easement is treated as a sale of property if the taxpayer's use of the property is substantially reduced by the easement. See Fasken v. Commissioner, 71 T.C. 650, 656 (1979); Scales v. Commissioner, 10 B.T.A. 1024 (1928). If the grant of the permanent easement does not substantially reduce the taxpayer's use of the property, then the grant is not treated as a sale. See Rev. Rul. 70-510, 1970-2 C.B. 159.

Petitioners' sale to Polk County included a permanent easement on 1.28 acres across the front of their property for $131,000.  This portion of the sale to Polk County was a right-of-way easement for use as a public highway.  Indeed, Polk County found this land so central to its public highway project that it offered to purchase the entire 5-acre property and threatened to condemn a portion of the property if petitioners did not sell.  The easement sales contract allowed an existing sign to remain on the land.  Petitioners had to remove, however, all other property from the right of way including all trailers, vehicles and other objects.  Polk County paid significant amounts for new fences and for so-called general damages, including tree removal.  The Mikels and petitioners subtracted the permanent easement price from the purchase option price for the property.[6]  These facts suggest that petitioners' use of the land subject to the permanent easement was substantially reduced.  We hold that petitioners' sale of the permanent easement on 1.28 acres for $131,000 is a sale of property.

---

[6]They did not, however, subtract amounts that Polk County paid to petitioners for a temporary easement, fencing, abstracting fees and general damages.

III. <u>Allocation of Proceeds and Basis</u>

We must next consider how much basis to allocate to the business use of the real estate and how much basis to allocate to the personal use, which includes petitioners' house that may qualify for exclusion as the sale of a principal residence under section 121. Petitioners' tenant, Mr. Mikel, testified that he leased one-quarter of the property for business purposes. He also testified that he was interested in the property for business purposes, not for a place to live. Mrs. Wickersham testified that one-third of the property was business use and two-thirds was residential. Pictures of the property support Mrs. Wickersham's view. Respondent determined that the business portion and residential portion were equal.

Petitioners sold mixed-use land. A taxpayer who intends to exclude gain from the sale of a principal residence must allocate the basis and the amount realized between the residential and the non-residential portions of the property using the same method of allocation that the taxpayer used to determine depreciation adjustments. Sec. 1.121-1(e)(3), Income Tax Regs. The parties have not provided us with the depreciation allocations. Despite citing the depreciation allocation regulation, respondent supports his allocation of business use and residential use with discussions of the geography of the land. The geography of the land supports petitioners' position, not respondent's. Accordingly, with respect to their basis in the land, we find

petitioners' allocation of two-thirds for the residential component and one-third for the business component to be appropriate.

We also need to determine basis so that gains on the sales can be calculated. We accept respondent's determination of a $25,000 basis for the house. Petitioners argue that their basis in the house is much larger, but have provided no substantiation.[7] The parties agree that the 5-acre parcel was purchased for $105,000. There was no residence on the property when petitioners bought the land, so the $105,000 basis is allocated to the land. The basis in the land will be allocated one-third to the business portion and two-thirds to the residential portion.

The permanent easement that was sold to Polk County ran across the front of the property, affecting both the business portion and the residential portion of the land. As a result, we find that the permanent easement is divided in the same way as the rest of the property. Specifically, we divide the permanent

---

[7]We noted above that the taxpayer generally bears the burden of proof, although it may shift to the Commissioner if the taxpayer satisfies certain conditions. Sec. 7491(a); Rule 142(a). We did not consider whether sec. 7491(a) would apply because our resolution of the issues is generally based on the preponderance of the evidence. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005). We note here that, with respect to petitioners' basis in the house, the burden of proof is relevant. Petitioners have introduced no evidence with respect to their construction of and improvements to the house, other than very general testimony about costs. Accordingly, we find that sec. 7491(a) does not apply.

easement into a one-third business portion and a two-thirds residential portion.

IV. <u>Sales of the Business Portion</u>

We will now consider the extent to which petitioners must recognize gain from these sales. We begin by considering the sale of the business portion of the property to the Mikels, even though it occurred after and subject to the easement sale to Polk County.

A. <u>Business: Sale of the Property to the Mikels</u>

Petitioners and respondent agree that petitioners must recognize gain on the sale of the business portion of the property to the Mikels. Petitioners argue that they must recognize a section 1231 gain with respect to that sale. Respondent argues that petitioners must recognize section 1250 gains with respect to that sale instead. We will define those terms and consider the parties' arguments.

The sale of certain property used in a trade or business is accorded favorable tax treatment (section 1231 property). Sec. 1231. "Property used in a trade or business" means real property used in a trade or business, held for more than a year, and subject to the allowance for depreciation. Sec. 1231(b)(1). The business portion of the property meets these criteria, and therefore is section 1231 property. The terms "section 1231 gain" and "section 1231 loss" refer to recognized gain or loss, respectively, on the sale or exchange of property used in a trade

or business.  Sec. 1231(a)(3).  Petitioners' section 1231 gains exceed their section 1231 losses for 2005.  Thus, any gains on the business portion are treated as long-term capital gains. Sec. 1231(a)(1).  Accordingly, petitioners' gain on the sale of the business portion of the property is a long-term capital gain under section 1231.

The analysis, however, does not end there.  Certain gains on the business portion sale subject to the allowance for depreciation must be recaptured.  Section 1250 property is any real property subject to the allowance for depreciation that is not section 1245 property.  Sec. 1250(c).  The business portion of the property was real property subject to the allowance for depreciation.  Further, the property is not of a kind described in section 1245(a)(3).  Therefore, the property is also section 1250 property.

Gain realized on the disposition of section 1250 property is recaptured as ordinary income, rather than capital gains, to the extent that the depreciation amount allowed or allowable exceeds the amount of depreciation that would have resulted under the straight-line method.  See sec. 1250(a).  This section 1250 gain is recognized as ordinary income notwithstanding any other provisions of subtitle A of the Code.  Sec. 1250(a)(1)(A).  The remaining depreciation claimed, after the section 1250 gain is recaptured at ordinary income tax rates, is unrecaptured section 1250 gain taxed at the 25-percent rate.  Because petitioners'

business portion of the property is both section 1231 property and section 1250 property, the amount of the long-term capital gain under section 1231 must be reduced by the amount of section 1250 gain recaptured at ordinary rates and at the 25-percent rate.[8]

    B.    <u>Business: Sale of the Easement to Polk County</u>

Petitioners concede that they must recognize income on the sale of the business portion of the easement to Polk County. Sec. 1001(c). They argue that the income they must recognize is section 1231 gain. Respondent does not dispute this argument. Accordingly, we hold that petitioners must recognize gain with respect to the business percentage of the sale of the easement, treating the property as section 1231 property.

## V. <u>Sales of the Residential Portion</u>

We will next analyze the sales of the residential portion of the property to the Mikels and the residential portion of the permanent easement to Polk County. As with the business portion, we begin by analyzing the sale to the Mikels.

---

[8]The parties have not provided sufficient information for us to calculate the sec. 1231 gain and the sec. 1250 gain. We look to the parties to calculate the appropriate tax in their Rule 155 computation.

A.   Residence: Sale of the Property to the Mikels

Petitioners and respondent disagree on whether petitioners may exclude gain realized when they sold their house to the Mikels.  Gain realized on the sale of property is generally included in a taxpayer's income.  Sec. 61(a)(3).  A taxpayer may, however, exclude from income gain on the sale or exchange of property if the taxpayer has owned and used the property as the taxpayer's principal residence for periods aggregating two of the five years immediately preceding the sale.  Sec. 121(a).  A married couple filing a joint return may claim a $500,000 exclusion on the sale or exchange of their principal residence if certain conditions are met.  Sec. 121(b)(2).  The only condition at issue in this case is whether petitioners used the property as their principal residence for sufficient time between 2000 and 2005.

Respondent contends that petitioners' principal residence was in Nebraska for the five years before the sale.  Respondent therefore argues that petitioners do not qualify for the exclusion with respect to their sale of the property.  To the contrary, petitioners argue that their primary residence remained in Iowa, despite their purchase of two residential properties in Nebraska.

The Code does not define "principal residence."  Whether a residence qualifies as the taxpayer's principal residence for purposes of section 121 is a question of fact that is resolved

with reference to all the facts and circumstances. Sec. 1.121-1(b)(2), Income Tax Regs.; see also Farah v. Commissioner, T.C. Memo. 2007-369. Taxpayers must occupy the residence for 24 full months or for 730 days to meet the 2-year use requirement. Sec. 1.121-1(c), Income Tax Regs. Short temporary absences, such as for vacation or other seasonal absence, are counted as periods of use. Id.

If a taxpayer alternates between two properties, using each as a residence for successive periods of time, the property that the taxpayer uses a majority of the time during the year ordinarily will be considered the taxpayer's principal residence. Sec. 1.121-1(b)(2), Income Tax Regs. Besides the use of the property, there are other relevant factors in determining a taxpayer's principal residence. These relevant factors include (I) the taxpayer's place of employment, (ii) the principal place of abode of the taxpayer's family members, (iii) the address listed on the taxpayer's Federal and state tax returns, driver's license, automobile registration and voter registration card, (iv) the taxpayer's mailing address for bills and correspondence, (v) the location of the taxpayer's banks, and (vi) the location of religious organizations and recreational clubs with which the taxpayer is affiliated. Id. We will consider each of these factors.

The first factor is whether petitioners spent at least 730 days at the property between October 2000 and October 2005.

Although petitioners held parties at Utter Place, they spent significant amounts of time in Iowa.  Indeed, they were never gone from Iowa for an extended period.  While in Iowa, they resided on the main floor of the property.  Their son and daughter-in-law occupied the finished basement of the house.

Petitioners used the house in Iowa as the family's home.  They hosted 15 to 20 familial parties a year.  They celebrated holidays and birthdays with their six children and 22 grandchildren in Iowa.  Mrs. Wickersham helped her children in Iowa with personal needs, such as moving and medical care.  She babysat for her grandchildren, sometimes for extended periods.  Petitioners did their holiday shopping, paid their insurance bills and purchased vehicles in Iowa.  They attended the yearly 10-day Iowa State Fair and their son's races in Iowa.  Petitioners' personal and family events and obligations in Iowa support their position.

Mr. Wickersham was diagnosed with throat cancer in Iowa, had throat surgery in Iowa and received 36 radiation treatments all in Iowa.  Mr. Wickersham also had hernia surgery in Iowa during the relevant time.

Respondent argues that petitioners merely visited Iowa; they resided in Nebraska.  It is our duty as the Court to listen to testimony, observe witnesses, weigh the evidence and distill the truth.  Diaz v. Commissioner, 58 T.C. 560, 564 (1972); Kropp v. Commissioner, T.C. Memo. 2000-148.  We are not required to accept

testimony if it is improbable, unreasonable or questionable. MacGuire v. Commissioner, 450 F.2d 1239, 1244-1245 (5th Cir. 1971), affg. T.C. Memo. 1970-89. We may, however, accept a taxpayer's testimony if we find it credible. See, e.g., Washington v. Commissioner, 120 T.C. 137, 150 (2003). We find that petitioners' testimony was credible in material respects. We find that petitioners did reside at the property for the requisite period.

The second factor is the taxpayer's place of employment. Petitioners did have a business, Utter Place, in Nebraska. Mrs. Wickersham credibly testified that they spent approximately a weekend per month to operate Utter Place. This factor is neutral.

A third factor is the principal place of abode of the taxpayer's family members. Petitioners had 28 children and grandchildren in Iowa. This factor weighs in petitioners' favor.

The fourth, fifth and sixth factors consider the addresses that the taxpayers provide and the location of their banks. Petitioners did not provide specific information about their banks, but generally stated that their service providers, including doctors, lawyers and bookkeepers, were located in Iowa. Petitioners held Iowa driver's licenses during the 5-year lease with the Mikels. Petitioners' vehicles were all registered, licensed and located in Iowa except for one. Petitioners received mail, including physicians' bills and bank statements,

both in Iowa and Nebraska.  Their credit card statements were mailed to the house in Iowa.  Neither petitioner ever registered to vote in either state.

Petitioners' Federal and Iowa State income tax returns for 2000 listed an Iowa address.  The returns for 2001 through 2004 listed an address in Nebraska.  Petitioners filed Nebraska State tax returns for 2002 and 2003 as residents using a Nebraska address.  They did not file a Nebraska State tax return for 2000, 2001, 2004 or 2005.

Petitioners argue that we should disregard the addresses they provided on tax forms, signed under penalties of perjury, because they did not prepare or review their tax returns.  They merely noted what they owed and signed them.  We should also disregard them, they argue, because no amounts were due.  We take seriously the address provided on the tax returns.

Respondent seeks to prove that petitioners were Nebraska residents because Mrs. Wickersham applied for and received a Nebraska liquor license.  Nebraska liquor licenses are granted only to Nebraska residents.  Petitioners counter that they also claimed homestead tax credits on the property, which would be available only to Iowa residents.  Petitioners were cavalier with their representations about state residence.  These three factors were a close call.  We find a majority of the factors, however, are in petitioners' favor.

The final, nonexclusive factor is the location of religious organizations and recreational clubs with which the taxpayer is affiliated. Mr. Wickersham has been a member of the Professional Musicians and Entertainers Club of Iowa for 20 years. Petitioners provided no meaningful information about Mr. Wickersham's level of involvement or time spent at this club. This factor is neutral.

In this case, we also consider petitioners' replacement home. Petitioners purchased a nearby residence in Colfax, Iowa after selling the property to the Mikels. This subsequent purchase, when viewed in conjunction with petitioners' and their witnesses' testimony, suggests that petitioners never sought to reside in Nebraska. This additional factor favors petitioners.

After weighing the testimony and evidence in this fact-intensive case, we find on the preponderance of the evidence that the house was petitioners' principal residence. Petitioners have each met the requisite use requirement of section 121 and are entitled to exclude up to $500,000 of gain from the sale of the residential portion of the property to the Mikels.

B.   Residence: Permanent Easement Sale to Polk County

We now consider the proper treatment of the residential portion of the permanent easement sale to Polk County. Petitioners argue that involuntary conversion principles allow them to defer gain on their easement sales to Polk County. See sec. 1033. We need not decide this issue, however, because

petitioners' income from the sale of the permanent easement regarding the residential portion of the property is exempt under section 121 up to $500,000.  Section 121 applies to the sale of the residential portion of the permanent easement to Polk County because petitioners sold the rest of the property to the Mikels within two years of their sale to Polk County.  See sec. 1.121-1(b)(3), Income Tax Regs.  Accordingly, petitioners' income from their sale of the residential portion of the permanent easement to Polk County is exempt to the extent permitted under section 121.

## VI. Accuracy-Related Penalty

Finally, we will consider whether petitioners should be subject to a penalty for underpaying their Federal income tax in 2005.  A taxpayer may be liable for a 20-percent penalty on any underpayment of tax attributable to negligence or disregard of rules or regulations or any substantial understatement of income tax.  See sec. 6662(a) and (b)(1) and (2); sec. 1.6662-2(a)(1) and (2), Income Tax Regs.  The accuracy-related penalty does not apply, however, to any portion of an underpayment for which there was reasonable cause and where the taxpayer acted in good faith.  See sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs.

Reasonable cause has been found when a taxpayer selects a competent tax adviser, supplies the adviser with all relevant information and, consistent with ordinary business care and prudence, relies on the adviser's professional judgment as to the

taxpayer's tax obligations.  Sec. 6664(c)(1); Estate of Young v. Commissioner, 110 T.C. 297 (1998); Am. Props., Inc. v. Commissioner, 28 T.C. 1100 (1957), affd. 262 F.2d 150 (9th Cir. 1958).  All facts and circumstances are considered in determining whether a taxpayer reasonably relied in good faith on professional advice, including the taxpayer's education, sophistication and business experience.  Sec. 1.6664-4(a) and (b), Income Tax Regs.

Petitioners hired Ms. Harris, an enrolled agent, at the recommendation of their longtime attorney.  Her firm prepares approximately a thousand income tax returns each year. Petitioners' return was the most complex that she had ever prepared.  Despite this fact, she failed to inform petitioners she was unsure.  Ms. Harris further testified that the IRS audited fewer than 25 of the returns she prepared in 22 years, and changes were required on only two returns after audits. Petitioners' return was one.  Ms. Harris paid a $1,000 return preparer penalty for errors in petitioners' return for 2005. This was the only time she had ever been assessed such a penalty. We find that Ms. Harris had sufficient expertise to justify petitioners' reliance.

We now turn to whether petitioners provided necessary and accurate information to Ms. Harris.  Mrs. Wickersham testified that petitioners did not understand taxes and that their daughter gathered financial information needed for the accountants to

prepare the returns.  Ms. Harris testified that she spoke with petitioners about the return for 2005 and believed she had all of the information necessary to prepare it.  We find that petitioners provided Ms. Harris with the necessary and accurate information to prepare the tax return for 2005.

Finally, we address whether petitioners relied in good faith on Ms. Harris' advice.  We find that petitioners did rely on her advice.  Mrs. Wickersham testified that petitioners never reviewed their tax returns as they were too complex.  We acknowledge that Mrs. Wickersham's education was only through the eighth grade.  We also acknowledge that the sale of the mixed use property requires a knowledge base and skill set different from those generally used in petitioners' business.  We do not sustain respondent's determination of the accuracy-related penalty because petitioners chose a competent advisor, properly provided information and relied in good faith on her advice.  Petitioners accordingly had reasonable cause for, and acted in good faith with respect to, the underpayment for 2005 and therefore are not liable for the section 6662(a) accuracy-related penalty.

We have considered all arguments made in reaching our decision and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.
