CHARLES R. BIDELSPACHER AND MARGERY T. BIDELSPACHER, Petitioers v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bidelspacher v. Commissioner
Docket No. 13966-78.
United States Tax Court
T.C. Memo 1980-538; 1980 Tax Ct. Memo LEXIS 48; 41 T.C.M. (CCH) 477; T.C.M. (RIA) 80538; December 4, 1980
Charles R. Bidelspacher and Charles Bidelspacher II, for the petitioners. *50 Stephen E. Sokolic, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1969
$ 7,399.00
1972
3,983.68
The year 1969 is involved as the result of a claimed net operating loss carryback from 1972. [1] In addition, petitioners are claiming an overpayment of $ 31,609.17, plus interest, for the year 1969 resulting from the claimed net operating loss carryback. The issues presented for decision are (1) whether petitioners are entitled to a deductible casualty loss in 1972 under section 165(c)(3), [2] resulting from Hurricane Agnes, and, if so, the amount thereof; (2) whether the Court has jurisdiction of the year 1969, and, if so, whether petitioners are entitled to a net operating loss carryback to that year. *51 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Charles R. Bidelspacher and Margery T. Bidelspacher (petitioners) are husband and wife whose legal residence was Williamsport, Pennsylvania, when they filed their petition in this case. Their joint Federal income tax returns for the years 1969 and 1972 were filed with the District Director of Internal Revenue, Philadelphia, Pennsylvania. In 1961 petitioners began acquiring property along the Susquehanna River in Williamsport, Pennsylvania. Their acquisitions were as follows: Date
Grantors
Acres
Cost
5-29-61
Earl and Margarette
75.8
$ 10,148.74
Minnick
6-8-61
Nelson and Joanna
41.4
12,607.00
Phillips
6-22-61
Adolfs and Zelma
28.9
12,639.15
Vitolins
7-31-63
Pennsylvania Railroad
4.4
915.50
Co.
6-15-67
Dale & Audrey Waltz
14.0
31,649.14
Nelson & Marian Waltz
4-24-72
Nelson and Joanna
1.0
2,537.50
Phillips
Total
165.5
$ 70,497.03
On June 22, 1972, the petitioners were the owners of the above property, which was located primarily in the City of Williamsport, *52 with a portion thereof located in Woodward Township, Lycoming County. Before June 22, 1972, the highest and best use of the property was for "recreational open space" purposes. Petitioners derived income from the property by renting riverfront lots and by selling fill dirt. Harry L. Nixon, a realtor-appraiser, described the Bidelspacher property prior to June 22, 1972, as follows: This property consists of 165.5322 contiguous acres in the form of an irregular shape with the wide base of the property running east and west 7,530.91 feet along the north shore of the West Branch of the Susquehanna River. The cross member of the property lies to the north and runs north from the base 3,000 feet at a width of about 900 feet. The eastern arm of the base has an average width of about 1,000' and the western arm about 250'. The property has all utilities. Outstanding features on the property are extensive forested and wooded tracts interspersed with meadows and sparsely treed grassy areas set around two fresh-water, spring-fed lakes. The map or plan (Exhibit 20) shows a wooded area that was formerly a swamp which, by 1971, was largely occupied by the fill of the State Highway easement. *53 Only a small portion of the swamp remains and is in the form of a wooded drainage area and is confined to a limited area located immediately south of the highway easement.
The elevation of the property is about 520 feet above sea level. The topography is generally level except for low sloping banks. Relief varies being higher on the north and south and lower in the middle generally following the bed of the old Pennsylvania Canal and the old course of Daugherty's Run. The property was well-drained by its two lakes; a stream (Daugherty's Run); old Pennsylvania Canal; a wide 2,200' long State constructed channel; and by the West Branch of the Susquehanna River. The private road system that provided excellent access to all parts of this property was likewise well-drained by this extensive and effective drainage system.
There were slightly over five miles (26,450 feet) of dirt and stone-based private roads on the Bidelspacher property, not including numerous driveways and individual accessways to the Susquehanna River. Mr. Dixon described in detail the roads on the property and concluded: The Bidelspacher property was truly served by fine roads to every part of this property before *54 the Hurricane on June 22, 1972. These roads were all well-graded, well-drained, stone-based, level roads with wide, well-graded and drained shoulders. Two vehicles could pass with ease on all of these private roads. On June 11, 1969, the Commonwealth of Pennsylvania, Department of Transportation, obtained by condemnation an easement on 11.95 acres of the Bidelspacher property for the purpose of constructing a limited access highway and a channel to direct a stream, known as Daugherty's Run, to the Susquehanna River.The petitioners filed eminent domain proceedings in the Court of Common Pleas for Lycoming County, Pennsylvania, No. 816 (May Term 1969). On or about September 26, 1969, petitioners received a pro tanto payment of $29,300 from the Commonwealth of Pennsylvania with respect to the condemnation.The amount was based on the Appraisal Report of William K. Groover dated March 11, 1969. At the time petitioners received this payment their property consisted of 164.5 acres with a cost basis of $ 67,959.53. The sum of $ 8,000 of the $ 29,300 represented severance damages. After the appointment of a Board of Viewers in the eminent domain proceedings in the Court of Common *55 Pleas of Lycoming County, several days of hearings were held in August 1974. On January 20, 1975, the Board of Viewers filed a report with the Common Pleas Court.Its Conclusion and Award provided as follows: The Board of Viewers reports that after a full and impartial consideration of all the evidence submitted to them, and after a careful view of the premises and acting according to their best judgment, they have determined as a result of the condemnation and appropriation of the premises of the condemnees situated in the City of Williamsport, as described in Exhibit A attached to this report, that the condemnees, Charles R. Bidelspacher, Esq. and Margery T. Bidelspacher, his wife, have sustained general damages in the amount of One Hundred Forty-eight Thousand Seven Hundred Seventy ($ 148,770.00) Dollars, and that the total award is One Hundred Forty-eight Thousand Seven Hundred Seventy ($ 148,770.00) Dollars. Said sum is assessed against the Commonwealth of Pennsylvania, Department of Transportation and is to be paid by it to Charles R. Bidelspacher, Esq. and Margery T. Bidelspacher, his wife, subject to any liens which may appear of record against said premises. Of the total *56 sum awarded above, the sum of One Hundred Thirty-three Thousand One Hundred Seventy ($ 133,170.00) Dollars represents the general damages attributable as severance damages to the part of the property not taken in accordance with Section 511 (6) of the Eminent Domain Code, 26 P.S. 1-511 (6). Petitioners later received the amount of the condemnation award. The Bidelspacher property or a portion thereof was subjected to flooding at least once a year both before and after June 22, 1972. The parties have stipulated that the "value" of the Bidelspacher property before Hurricane Agnes (June 22, 1972) was $ 82,766. [3]
*57 On June 22, 1972, the Bidelspacher property was struck by a violent storm, Hurricane Agnes, [4] which was probably the greatest natural disaster to hit the Williamsport area. Over 13 inches of water fell on the area within a 24-hour period. The Bidelspacher property was submerged in water ranging from 26 to 36 feet deep. The huge volume of water, its currents and the attendant hurricane winds damaged the roads on the property, docks and wharves along the river, a stone bridge and tore out the riprap (stone lining) in a sizeable section of Daugherty's Run which crossed part of the property. Mud and silt covered the property when the flood waters subsided. Pursuant to the Disaster Relief Act of 1970, Pub. L. 91-606, 84 Stat. 1744, the President of the United States declared all of Pennsylvania a disaster area on June 30, 1972. Petitioner Charles R. Bidelspacher applied to the Federal Small Business Administration in October 1972 for a disaster loan. The application was initially examined by D.L. Butts of the General Adjustment Bureau, who determined that the cost of *58 repair to the property was $ 50,000, primarily for removal of silt. In January 17, 1973, Stanley S. Durham, another appraiser for SBA, determined the amount of the loss to be $ 71,900, i.e., $ 5,200 for the reapir of an earthen dam and $ 66,700 to "remove silt from gravel pit." On October 13, 1973, Kenneth Kiger, an SBA loss verifier, authorized a loan of $ 50,000. No loan funds were ever disbursed by SBA to petitioners. They decided not to remove the silt from their property. Mr. Bidelspacher obtained the following estimates from four contractors for the replacement of riprap stone along the channel of Daugherty's Run, the replacement of fill dirt eroded by Hurricane Agnes and to restore and rebuild the roadways on the property: Contractor
Date
Amount of Estimate
John A. Bubb
5-29-75
$ 293,967.50
J.T. Keliher, Inc.
5-29-75
252,000.00
Bloomsburg Sand &
7-07-75
262,507.00
Gravel Co., Inc.
Dissen & Juhn
6-03-75
334,000.00
Corporation
Petitioners did not enter into any contract for such work and no work was performed. Dewey A. Wagner, an expert witness for petitioners, is a qualified, licensed real estate broker and appraiser who examined *59 the Bidelspacher property both before and after June 22, 1972. It was his opinion that the fair market value of the property before June 22, 1972, was $ 75,000 and that its value after the Hurricane Agnes storm disaster was $ 4,000, or a loss in value of $ 71,000. It was also his opinion that the highest and best use for the property prior to June 22, 1972, was recreational and after that date it was "estimated to be wasteland." His report dated August 4, 1975, is in evidence as Exhibit 31. Harry L. Nixon, an expert witness for petitioners, is a qualified, licensed real estate broker and appraiser, who examined the Bidelspacher property both before and after June 22, 1972. It was his opinion that the fair market value of the property before June 22, 1972, was $ 82,766 and that its value after the Hurricane Agnes storm disaster was $8,277, or a loss in value of $ 74,489. It was also his opinion that the highest and best use for the property after the disaster was as "wasteland." His report dated August 12, 1975, is in evidence as Exhibit 32. In the Report of Board of Viewers filed January 20, 1975, in the Court of Common Pleas of Lycoming County, Action No. 816, the Board *60 found in paragraph 6 thereof that "the highest and best use of condemnees' [Bidelspacher's] property is for water related recreational development having riparian rights on a federal waterway." This was also the purpose for which it was being used in 1969 when the Commonwealth of Pennsylvania took its easement on 11.95 acres. On August 28, 1975, Charles R. Bidelspacher acquired a one acre riverfront lot, surrounded by the Bidelspacher property, from Virginia D. Garison, Executrix of the Estate of Robert R. Garison, for the sum of $ 4,500. The deed of conveyance provided that-- Grantor further grants to Grantee, his heirs, executors, administrators and assigns, a right to use for the purpose of egress and ingress to and from the premises herein conveyed a twelve (12) foot lane, extending northward and crossing a bridge at Daugherty's Run from whence it extends northeasterly to a road extending to and crossing the Flood Control Levee. In answer to respondent's interrogatories served on September 7, 1979, petitioners stated that the Bidelspacher property was "used to supply anchorage sites and earth material," and that their gross receipts and net profits from such income-producing *61 activities were as follows: Year
Gross
Net
Anchorage Sites
1969
$ 6,585.00
$ 2,851.00
1970
6,485.00
4,537.38
1971
7,490.00
4,008.97
1972
6,810.00
328.49
1973
3,425.00
596.33
1974
5,479.25
(1,942.74)
1975
6,085.02
1,682.46
Earth Material
1969
none
none
1970
13,547.00
9,478.47
1971
12,452.30
6,665.01
1972
32,530.00
1,569.12
1973
19,069.19
3,320.18
1974
none
none
1975
4,821.91
1,333.22
Petitioners gave the following explanation with respect to such gross receipts and net profits: The Disaster Storm Hurricane Agnes on June 22, 1972 had a profound adverse effect on gross income. For example, the anchorage site gross income for 1972 was $ 6,810. and of this amount $ 6,735. was income collected before Disaster Storm Hurricane Agnes struck this property on June 22, 1972 and only $ 75. came in during the whole balance of the year 1972. For example, more than 77% of the gross income from earth material for 1972 was before the day Hurricane Agnes struck and less than 23% was after June 22, 1972. For another example, more than 88% of the gross income from earth material for 1973 was for business generated before *62 the Disaster Storm Hurricane Agnes hit on June 22, 1972 and only less than 12% was generated after the Hurricane hit. On June 22, 1972, the petitioners' adjusted basis in their property was $57,558.26, computed as follows: Adjusted basis before
$ 67,959.53
condemnation (164.5
acres)
Less: Basis of property
4,938.77
allocable to easement
$ 63,020.76
Less: Amount of severance
damages from condemnation
8,000.00
$ 55,020.76
Add: Adjusted basis of
1.033 acres acquired
April 24, 1972
2,537.50
Adjusted basis on June 22,
1972
$ 57,558.26 [5]
*63 Petitioners' Federal income tax return for 1972 shows "Income other than wages, dividends, and interest" in the amount of $ 24,163.80 and "adjusted gross income" of $ 34,074.52. On the return the petitioners claimed a casualty loss of $ 70,497.03 and a net operating loss of $ 50,399.94 to be carried back and forward as provided by law. In his statutory notice of deficiency dated September 28, 1978, respondent disallowed the casualty loss for 1972 and the claimed net operating loss carryback to the year 1969. On November 19, 1973, the Tax Court entered a stipulated decision determining a deficiency of $ 26,425.90 in petitioners' Federal income tax for the year 1969. The decision became final of February 17, 1974. See sections 7481(a)(1) and 7483. On November 21, 1973, petitioners filed an application for tentative refund (Form 1045) taking into account the deficiency determined in the Court's decision. The deficiency was not assessed by respondent until January 21, 1974. Since the deficiency had not yet been assessed, respondent allowed the petitioners a tax decrease of $ 7,399 for 1969 in response to the application for tentative refund. Such amount represented the tax *64 liability shown on petitioners' 1969 income tax return. This amount ($ 7,399) with interest was refunded to petitioners on March 4, 1974. In a letter dated January 16, 1974, respondent had advised petitioners to file a claim on Form 843 after they received their computation of the deficiency assessed. This advice was given because of the statutory prohibition in section 6404(b) against claims for abatement of income taxes. Petitioners did not pay the deficiency assessment at that time, but instead they filed a claim for abatement thereof. In his letter of June 26, 1974, respondent disallowed the claim for abatement. The application for tentative refund, which was attached to the claim for abatement, was treated as a separate application and was disallowed as being untimely. Respondent could not have considered the amount of the stipulated deficiency covered by the decision entered on November 19, 1973, because it had not yet been assessed when the application for tentative refund was filed. A deficiency does not become a liability of the taxpayer until the assessment is made. The assessment of the deficiency for 1969 was made by respondent on January 21, 1974, in the total *65 amount of $ 32,256.97 which represented tax of $ 26,425.90 and interest of $ 5,831.07. Again, on August 14, 1974, petitioners filed a claim on Form 843. On November 17, 1975, respondent sent the petitioners a "Final Notice Before Seizure" with respect to the assessment of the deficiency and interest. To avoid seizure of their property, petitioners paid by check under protest on November 26, 1975, the amount of $ 31,609.17. Thus, petitioners have alleged in their petition in this case that they are entitled to an overpayment for 1969, resulting from a net operating loss in 1972. ULTIMATE FINDINGS OF FACT 1. The fair market value of the Bidelspacher property after Hurricane Agnes (June 22, 1972) was $ 62,766. 2. Petitioners sustained a deductible casualty loss of $ 20,000 in 1972 that resulted from the damage caused by Hurricane Agnes. OPINION Issue 1--Claimed Casualty Loss Deduction
The first issue confronting us is whether the petitioners are entitled to a casualty loss deduction for alleged damage caused by Hurricane Agnes to their property on the Susquehanna River at Williamsport, Pennsylvania, on June 22, 1972, and, if so, in what amount. At the outset *66 we note that the burden falls on the petitioners to prove that they are entitled to their claimed casualty loss deduction.Rule 142(a), Tax Court Rules of Practice and Procedure; Axelrod v. Commissioner,56 T.C. 248 (1971). The loss must be permanent, and not merely temporary damage or interruption in the use of the property. J. G. Boswell Co. v. Commissioner,302 F.2d 682 (9th Cir. 1962), affg. 34 T.C. 539 (1960); Peterson v. Commissioner,30 T.C. 660 (1958). Relying on statements of law relating to the burden of proof contained in Demkowicz v. Commissioner,551 F.2d 929, 931 (3d Cir. 1977), and Baird v. Commissioner,438 F.2d 490, 492-493 (3d Cir. 1971), the petitioners argue in their reply brief that they have presented sufficient evidence to overcome the presumption of correctness attaching to the respondent's deficiency determination and that the burden of going forward with the evidence shifted to the respondent and he had failed to carry that burden. We disagree. It is true that *67 respondent did not offer the expert testimony of a real estate appraiser as to the value of the property after Hurricane Agnes, but instead chose to rely upon his cross-examination of petitioners' expert witnesses and other relevant and probative facts contained in the record. To shift to respondent the burden of going forward with the evidence, the petitioners must overcome the presumption by presenting "competent and relevant credible evidence." Baird v. Commissioner,supra at 493. This Court is not bound to accept testimony as to the value of property if it finds such testimony to be "improbable, unreasonable or questionable." Demkowicz v. Commissioner,supra at 931; Fixel v. Commissioner,T.C. Memo. 1974-197, affd. without opinion 511 F.2d 1400 (5th Cir. 1975); cf. United States v. 3,698.63 Acres of Land, etc.,North Dakota,416 F.2d 65 (8th Cir. 1969). For reasons stated later in this opinion we have concluded, after careful consideration and close analysis of the facts in this record, that *68 the post-casualty values of the Bidelspacher property determined by petitioners' witnesses are not fully reliable or correct. Thus, we think the ultimate burden of proof in this case remained on the petitioners. Section 165(a) allows a deduction for any loss sustained during the taxable year and not compensated by insurance or otherwise. The regulations provide that the amount deductible as a casualty loss is the lesser of: (1) the amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty, or (2) the adjusted basis of the property determined under section 1.1011-1 of the regulations. [6]
*69 The regulations also specify the method of valuation. Section 1.165-7(a)(2)(i) provides that fair market value before and after the casualty "shall generally be ascertained by competent appraisal." Section 1.165-7(a)(2)(ii) provides that the cost of repairs is acceptable as evidence of the loss of value. [7]
*70 This Court has construed section 1.165-7(a)(2)(ii) as requiring evidence of repairs and expenditures actually made.In Lamphere v. Commissioner,70 T.C. 391, 396 (1978), we said: In Farber v. Commissioner,57 T.C. 714, 719 (1972), we specifically rejected the use of estimates as not being "persuasive." It was held that the regulation "contemplates actual repairs and expenditures." We think the regulation provides simplicity and ease of administration. It guards against possible abuse that would result from the use of flexible or inflated estimates of repairs, particularly in situations where the repairs are never made. Consequently, we conclude that the estimated cost of drilling a new well is not allowable as part of the loss of value under the "cost of repairs" method. Here the petitioners rely in part on the estimates of four contractors to support the existence and the amount of their claimed loss. Such estimates are not appraisals. They quote prices for establishing six to eight-inch stone-based roads to a width of 20 feet, installing approximately 1,200 feet of riprapping in Daugherty's Run channel, and replacing fill dirt allegedly *71 eroded by Hurricane Agnes.All four estimates state that the work proposed to be done is necessary to repair the damage caused to petitioners, property by the storm. We think the contractors' estimates must be disregarded for several reasons. First, the contractors did not have personal knowledge of the condition of the roads on the property and whether Daugherty's Run channel was completely riprapped prior to Hurricane Agnes. Second, three of the estimates quote the cost of repairs on the dates they were given, which were about three years after the date of the storm. Third, the work to which the estimates relate was never performed. Thus, under the rationale of the Lamphere opinion, it is our view that the estimates do not establish the amount of any loss to the Bidelspacher property. Petitioners also rely on reports prepared for the Small Business Administration in connection with their application for a disaster loan. Such reports are not appraisals of the property and they do not determine the fair market value of the property after June 22, 1972. Three of them are damage estimates. The two prepared by Mr. Butts estimate a cost of $ 50,000 to remove silt from *72 the property. The third report, which was prepared by Mr. Durham, estimates a cost of $ 66,700 to remove silt and $ 5,200 for fill dirt to repair a dam. The report notes that the silt "must be removed to mine product sold to contractor building Belt road." The fourth report is entitled "Request for Inspection/Disbursement Report" and again contains a description of the silt removal process. Mr. Kiger, a loss verifier for SBA, testified that the work which was the subject of the SBA estimates was never performed. Hence, under the Lamphere rationale, these repair estimates do not establish the amount of the loss claimed by petitioners. Furthermore, it is questionable whether the silt had to be removed in order that the underlying dirt could be sold. Mr. Durham testified that he obtained this information from Mr. Bidelspacher. However, Robert Santai, the representative from S.J. Groves and Sons Company, the contractor for removing fill dirt from petitioners' property both before and after Hurricane Agnes, testified that it was not necessary for the silt to be removed for his firm to take fill dirt from the property. They would either push the silt aside or take it along with *73 the fill dirt. Thus, the sale of fill dirt was not affected by the silt. Indeed, the record shows that the petitioners continued to receive income from the sale of dirt in years subsequent to 1972. For example, their gross receipts from fill dirt in 1973 were $19,069.19. Petitioners rely heavily on the reports and testimony of two realtor-appraisers, Dewey A. Wagner and Harry L. Nixon, who gave their opinions as to the fair market value of the Bidelspacher property before and after it was struck by Hurricane Agnes. A pre-casualty value of $ 82,766 has been stipulated by the parties, and such value is accepted by the Court, albeit with some reservation as to its accuracy. In Mr. Wagner's opinion the value of the property after Hurricane Agnes was $ 4,000 (approximately $ 24 per acre), for a loss in value of $ 71,000. Mr Nixon's opinion was that the post-casualty value of the property was $ 8,277 (approximately $ 50 per acre), for a loss in value of $ 74,489. Both appraisers stated that the highest and best use of the property after Hurricane Agnes was as "wasteland" whereas its best use before June 22, 1972, was for recreational purposes. We think, based on their reports *74 and testimony as a whole, that petitioners' witnesses did not give adequate consideration to some factors which were actually present and which in our judgment seriously affected their conclusions as to the post-casualty value of the Bidelspacher property.Therefore, we reject, as improbable and questionable, their opinions as to the amount of the property's loss in value.We believe the valuations proposed by them are faulty for several reasons. First, the independent finding made by the Board of Viewers in their report filed on January 20, 1975, with the Court of Common Pleas of Lycoming County was that the Bidelspacher property was then used, and had been used since 1969, for recreational purposes and development. This contradicts the opinions of Mr. Wagner and Mr. Nixon. In addition, the Board of Viewers awarded petitioners $ 148,770 of which $ 133,170 represented severance damages to the part of the property not taken by condemnation. Such award shows the substantial value of the property. Second, Elinor Lorson and Marvin Crawford testified that they rented riverfront lots from the petitioners subsequent to 1972. Mrs. Larson also said that to her knowledge all of the lots on *75 the petitioners' property were rented in years after 1972 and, in fact, rental rates were increased. Third, the petitioners received gross income for the years 1973 through 1975 totaling $ 14,989.27 from the rental of riverfront sites, and they received gross income from the sale of fill dirt in the amounts of $ 19,069.19 for 1973 and $ 4,821.91 for 1975. Even in 1972, after Hurricane Agnes, they had gross receipts from the sale of earth material of approximately $ 7,481. Fourth, in August 1975 Mr. Bidelspacher purchased a one acre tract of land, surrounded by his other property, for $ 4,500. He testified that he wanted this property to extinguish the owners' rights in certain roads and in a bridge. He said this was very important to him. It seems highly unlikely to us that, if all of his other property was mere "wasteland," he would have paid $ 4,500 to acquire one acre when the surrounding land was worth at most $ 50 an acre. We have not set forth in detail all of the respects in which we think the valuations proposed by petitioners' witnesses are incorrect. The prior discussion is intended to show merely in a general way that we cannot accept a post-casualty valuation of *76 the Bidelspacher property as being between $ 4,000 and $ 8,277. However, we do not reject completely the evidence presented by these witnesses. Their testimony was helpful, especially with respect to the damage caused by Hurricane Agnes to the road system on the property, to the stone bridge and to that portion of the riprap on Daugherty's Run channel.We have taken it into account. We reject respondent's contentions that the petitioners have failed to establish that there was any decrease in the fair market value of their property as a result of Hurricane Agnes or, if there was any damage to the Bidelspacher property, it was not caused by Hurricane Agnes, but rather by the construction of the new Daugherty's Run channel by the Commonwealth of Pennsylvania for which the petitioners have already been compensated in the eminent domain proceedings. In our view this matter is not susceptible of precise determination on this record, but, doing the best we can with the facts and evidence before us, we conclude, and we have so found as an ultimate fact, that the property had a post-casualty fair market value of $ 62,766. Thus, we find that the petitioners sustained a deductible casualty *77 loss of $ 20,000 that was proximately related to the damage caused by Hurricane Agnes. Cf. Heyn v. Commissioner,46 T.C. 302, 310 (1966); Cohan v. Commissioner,39 F.2d 540, 544 (2d Cir. 1930); Commissioner v. Thompson,222 F.2d 893, 895-896 (3d Cir. 1955), affg. 21 T.C. 448 (1954), where the Court of Appeals stated: We agree with the Tax Court that the Commissioner's reliance upon the prima facie correctness of his zero value should be rejected. Although, as the Tax Court said, the problem of valuation is difficult, it is not insuperable. It is the function of the trier of fact to weigh all the elements properly considered in the valuation and to translate them into dollars and cents. If there is speculation in this, it is a product of the nature of the problem, but not a reason for abdicating the judicial function, * * * Nor is it essential "* * * that there be testimony of the specific figure fixed by the Tax Court." Burford-Toothaker Tractor Co. v. Commissioner, 5 Cir., 1951, 192 F.2d 633, 635, certiorari denied 343 U.S. 941, 72 S. Ct. 1033, 96 L.Ed. 1347. And if the amount fixed *78 is on the low side, it is attributable to the lack of more specific evidence on the part of the taxpayers. * * * Issue 2--Jurisdiction as to Year 1969 and Claimed Net Operating Loss Carryback
As previously indicated, respondent filed on August 12, 1980, a motion to dismiss the year 1969 for lack of jurisdiction and to strike paragraphs of the petition and answer relating thereto. On September 15, 1980, the petitioners filed a notice of objections to respondent's motion. The pertinent facts with respect to this jurisdictional issue can be summarized as follows. On November 21, 1972, a statutory notice of deficiency for the year 1969 was mailed to the petitioners. They filed a timely petition with this Court on February 20, 1973, and the respondent subsequently answered the petition. On November 19, 1973, the Court entered a stipulated decision redetermining a deficiency of $ 26,425.90 in petitioners' Federal income tax for the year 1969. That decision became final on February 17, 1974. On September 28, 1978, respondent mailed to petitioners a statutory notice of deficiency for the years 1972 and 1969 determining Federal income tax deficiencies of $ 3,983.68 and $ 7,399, *79 respectively.The determined deficiency for 1969 resulted from respondent's disallowance of a claimed net operating loss carryback from the year 1972 to 1969. In Midland Mortgage Co. v. Commissioner,73 T.C. 902 (1980), this Court held that a statutory notice of deficiency was invalid under section 6212(c)(1), where, as here, it was issued with respect to a loss carryback year in which a decision of the Court had previously been entered and had become final, thus depriving the Court of jurisdiction as to the loss carryback year. The rationale of our opinion in that case applies with equal force here. Midland Mortgage Co. v. Commissioner,supra at 906-912. Accordingly, we hold that the notice of deficiency sent to petitioners on September 28, 1978 is invalid insofar as it relates to the year 1969 and, therefore, this Court lacks jurisdiction over that year. The motion to dismiss the year 1969 for lack of jurisdiction will be granted, and to reflect our findings and conclusion with respect to the casualty loss issue for 1972, Decision will be entered under Rule 155.
Footnotes
1. On August 12, 1980, after the trial of this case, respondent filed a motion to dismiss the year 1969 for lack of jurisdiction. On September 15, 1980, petitioners filed a notice of objection to the motion. The issue will be addressed later in this opinion.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated.↩
3. Although this figure was obviously taken from the appraisal report of Harry L. Nixon dated August 12, 1975, and agreed to by the parties, the Court has serious reservations as to whether such amount accurately represents the "fair market value" of the property on June 22, 1972. In this connection we note that the Appraisal Report of William K. Groover (made for the Commonwealth of Pennsylvania) shows the fair market value of the property to have been $ 222,000 on March 3, 1969; that the easement on only 11.95 acres was worth at least $ 21,300; and that the petitioners bought slightly over one acre from Nelson and Joanna Phillips on April 24, 1972, for $ 2,537.50.↩
4. Tropical Storm Agnes is fully described in a two volume report of the U.S. Army Corps of Engineers.↩
5. Petitioners' cost basis must be adjusted in two respects as a result of the condemnation of an easement across a portion of their property and the receipt of condemnation proceeds in 1969. The first adjustment is to the basis of the acreage which was subject to the easement to reflect that a portion of petitioners' property was in fact condemned. Fasken v. Commissioner,71 T.C. 650 (1979); Rev. Rul. 68-291, 1968-1 C.B. 351. The second adjustment is to the basis of the property not actually taken which must be reduced by the amount of the severance damages received. Vaira v. Commissioner,444 F.2d 770, 774↩ (3d Cir. 1971).For tax purposes the severance damages ($ 8,000) are not includable as an amount realized from the condemnation but they do reduce the basis of the property not taken.
6. Section 1.165-7(b)(i), Income Tax Regs., provides, in pertinent part, as follows: (b) amount deductible--(1) General rule. In the case of any casualty loss whether or not incurred in a trade or business or in any transaction entered into for profit, the amount of loss to be taken into account for the purposes of section 165(a) shall be the lesser of either-- (i) The amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty; or (ii) The amount of the adjusted basis prescribed in § 1.1011-1 for determining the loss from the sale or other disposition of the property involved. Section 1.1011-1 of the Income Tax Regs., provides as follows: The adjusted basis for determining the gain or loss from the sale or other disposition of property is the cost or other basis prescribed in section 1012 or other applicable provisions of subtitle A of the Code, adjusted to the extent provided in sections 1016, 1017, and 1018↩ or as otherwise specifically provided for under applicable provisions of internal revenue laws.
7. Section 1.165-7(a)(2), Income tax Regs., provides as follows: (2) Method of valuation. (i) In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal. This appraisal must recognize the effects of any general market decline affecting undamaged as well as damaged property which may occur simultaneously with the casualty, in order that any deduction under this section shall be limited to the actual loss resulting from damage to the property. (ii) The cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that (a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent↩ for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty. [Emphasis supplied.]